611 A.2d 105

**BECKENHEIMER'S INC. et al.**

v.

**ALAMEDA ASSOCIATES LIMITED PARTNERSHIP et al.**

**No. 124, Sept. Term, 1991.**

Court of Appeals of Maryland.

Aug. 25, 1992.

Angus R. Everton (Roy L. Mason, David J. Norman, Mason, Ketterman & Morgan, P.C., Marvin I. Singer, Hooper, Kiefer & Cornell, all on brief), Baltimore, for appellants.

Lawrence S. Greenwald (David H. Fishman, David W. Lease, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, all on brief), Rob Ross Hendrickson (Albert G. Boyce, Boyd, Benson and Hendrickson, all on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

RODOWSKY, Judge.

This case involves efforts by a subtenant to renew a sublease of food supermarket premises in a shopping center. The principal question is whether certain departures by the subtenant from strict compliance with the renewal provisions nevertheless leave the renewal efforts within tolerances that permit equity to enforce the sublessor's covenant to renew.

The shopping center involved is in the northwest quadrant of the Alameda and Chinquapin Parkway in northeast Baltimore City. The center was developed in the mid-1950s as "Alameda Shopping Center," but was later renamed "Belvedere Plaza Shopping Center," (Shopping Center). The supermarket premises, containing 20,000 square feet on the first floor and a 10,000 square foot basement, with the use of 876 parking spaces, were leased in 1957 by Samuel M. and Constance V. Pistorio (the Pistorios) to American Stores Company, assignor of Acme Markets, Inc. (Acme), one of the two appellees herein (the Prime Lease). That original Prime Lease was for a term of fifteen years, with renewals. The fixed rent was $3,333.34 per month, plus a percentage rent of one percent of gross sales in excess of $4 million per year. The tenant covenanted to "furnish Landlord with a statement supporting said rental payment certified to as correct by Tenant's Accounting Department."

Amendments to the Prime Lease in 1958 reduced the parking to spaces for 745 cars. In 1978 the Pistorios and Acme again amended their lease when Acme obtained the right to make certain improvements, at its expense. The then current term was extended through August 31, 1989, with an option in the tenant to renew for five additional terms of five years each. The fixed rent was changed to $5,000 per month, with a percentage rent of one percent on gross sales exceeding $10 million per year.

The sublease with which we are here concerned was made in 1982, after the Pistorios had sent Acme a notice of termination. That notice was withdrawn when Acme, on November 29, executed a sublease (the Sublease) with one of the appellants, Beckenheimer's, Inc. (Beckenheimer's). The Sublease "continue[d] for the remainder of the term of the Lease (less one month) and any renewal or extended term(s) (less one month)." Acme and Beckenheimer's agreed that "each and every covenant and agreement of the Lease" was "a term, condition, covenant and agreement of [the] Sublease," except as provided in the Sublease. The rent was $60,000 per year, payable monthly in advance in

$5,000 installments, and a percentage rent. At the same time the percentage rent under the Prime Lease was modified to one percent on gross sales exceeding $7,500,000. This change was effected by a "Consent Agreement" executed by the Pistorios and agreed to both by Acme and by Beckenheimer's.[1]

The Sublease contains the following paragraph concerning Beckenheimer's right to renew.

"Sublessee shall have the right to renew this Sublease for the additional five (5) year [sic] terms of five (5) years each (the 'Renewal Term(s)') provided for in the Lease, *provided as a precondition to the exercise of each Renewal Term,* (1) *Sublessee shall have given Sublessor notice of Sublessee's election to do so at least one hundred twenty (120) days prior to the expiration of the initial ten (10) year term or the then current Renewal Term of the Lease* (2) Sublessee shall not be in default under this Sublease at the time of such notice and (3) *the net worth of Sublessee on the date of such notice (as evidenced by the most recent certified financial statements of Sublessee which shall be included with such notice) is at least equal to the net worth of Sublessee on the date hereof.* All terms and conditions of this Sublease for each Renewal Term shall remain the same as for the initial term except that the annual base rental

---

1. In its answers to interrogatories Beckenheimer's identifies as a document on which it relies a consent agreement dated November 22, 1982 between the Pistorios, Acme and itself. The document indicates it was signed by the Pistorios on November 29. Beneath their signatures is: "Agreed to this 22nd day of November, 1982," and the signature of Acme. Beneath that signature, both on the record extract copy and in the original record, is a line reading: "Agreed to this 29th day of November, 1982," but no signature is reproduced. The signature, if any, is cut off by the bottom of the photocopy page. No other document in the record is entitled, "Consent Agreement." We infer that the unreproduced signature on the Consent Agreement is Beckenheimer's. Thus, we conclude that Beckenheimer's agreement in the Sublease to perform the covenants of Acme in the Prime Lease included the modifications concerning percentage rent in the Prime Lease effected by the Consent Agreement.

(not including percentage rental) shall be Sixty-six Thousand and 00/100 Dollars ($66,000)."

(Emphasis added).

The Sublease also provided that notices from one party to the other be in writing and personally delivered or sent by registered or certified mail. Further, "[a]ny such notices shall not be deemed to have been given to Sublessor until actual receipt thereof by Sublessor." Thus, any Beckenheimer's notice of a renewal to follow expiration of the original term of the Sublease was to be received by Acme on or before May 4, 1989. *Cf.* Maryland Rule 1–203(b) (computation of time before a day).

At the end of 1983 all of the Pistorios' interest in the Shopping Center was acquired by the other appellee, Alameda Associates Limited Partnership (Alameda). Counsel for Beckenheimer's represent that "[t]he outstanding stock of Beckenheimer's [was] purchased by B. Green [ & Co., Inc. (B. Green) ] in 1986, and was subsequently sold by B. Green to Farm Fresh Supermarkets of Maryland in 1989." Brief of Appellant at 1 n. 1.

On April 26, 1989, a letter was sent by certified mail to Acme in Philadelphia, to the attention of Acme's Director of Real Estate, Mr. Henry Flieck, and received on May 1, 1989. It reads as follows:

"Dear Henry,

In accordance with the terms of the sublease dated November 29, 1982 between Acme Markets, Inc. and Beckenheimer's, Inc. and the lease between Samuel M. Pesterio [sic] and Constance Pesterio [sic], husband and wife with American Stores Company, as amended ... which collectively are referred to as the lease, we wish to exercise our option to renew the lease for another five years at the expiration of our present term.

Sincerely,

Martin Braun, Jr."

This letter was on the letterhead of B. Green, 3601 Washington Boulevard, Baltimore.

By letter dated May 4, 1989, signed by Benjamin L. Green as president of Beckenheimer's, Beckenheimer's wrote to Acme, to the attention of its house counsel, John Doerr, Esquire, as follows:

"Dear Mr. Doerr,

You are in possession of a certified letter dated April 26, 1989 addressed to Mr. Henry Flieck of your organization putting you on notice of the intention to renew our lease for the store in The Alameda Shopping Center. It was on B. Green & Co., Inc. stationary and signed by Martin Braun, head of real estate for B. Green and all of its subsidiaries. In further discussion with you, we found out that the lease in question was in Beckenheimer's, Inc. name, our wholly owned subsidiary, rather than B. Green & Co., Inc.

The purpose of this letter is to clarify the prior letter and to formally acknowledge on the part of Beckenheimer's, Inc., the intent to renew the lease of our store in The Alameda Shopping Center. I sincerely apologize for any difficulty this oversight may have caused.

Sincerely,

Benjamin L. Green

President

Beckenheimer's, Inc."

The foregoing letter, which does not appear to be registered or certified, was received by Acme on May 8. Prior thereto, on May 5, 1989, Acme, by Henry Flieck, had written to Beckenheimer's, by certified mail, addressed to 1607 North Washington Boulevard, the address for Beckenheimer's appearing in a notice paragraph of the Sublease. This letter advised that Beckenheimer's had failed to renew the Sublease by failure to give "timely notice and failure to provide a required net worth statement." [2]

---

**2.** Alameda's memorandum in support of its motion for summary judgment recites that the foregoing letter is attached as Exhibit 6. There are no exhibits attached to the memorandum in the original

Nevertheless, with respect to the Prime Lease, Acme, by letter of May 15 to Alameda, "exercise[d] the first five year option granted under [the Prime Lease], thereby extending the termination to August 31, 1994."

The net worth requirement in the conditions for renewal of the Sublease was addressed by Beckenheimer's in a letter of May 16 from counsel for Beckenheimer's, courier delivered to Acme on May 19. Among enclosures to that letter was a copy of the federal income tax return for the fiscal year of Beckenheimer's ended June 27, 1988. The balance sheet in the tax return reflected a net worth of nearly $3.7 million. Also enclosed was a "[c]ertificate" by the president of Beckenheimer's representing that records showing that corporation's net worth in 1982 had not been located, that as of August 25, 1984, the net worth was $791,937, and that "[t]he last certified financial statement," as of December 28, 1985, showed a net worth of $1.581 million.

Meanwhile Alameda, apparently because it hoped to put a fast food operation on the parking lot, sought to have Acme withdraw its renewal of the Prime Lease. There is no evidence that Acme ever did so.[3] Thereafter, by an agreement intended to be effective August 31, 1989, and in consideration of the payment by Alameda to Acme of $100,-000, Alameda and Acme terminated the Prime Lease (Lease Termination Agreement). In the Lease Termination Agreement Acme certified that the Sublease was the only sub-

---

record transmitted to us. No exhibits to that memorandum are reproduced, as such, in the record extract.

A separate action for declaratory judgment against, *inter alia,* Alameda and Acme was brought by Farm Fresh Supermarkets of Maryland, B. Green, and Beckenheimer's, in the Circuit Court for Baltimore City and consolidated with the instant action. The May 5, 1989, letter is an exhibit in that consolidated case. Under these circumstances we take judicial notice of the record in that consolidated case even though it was not transmitted to this Court because no judgment has been entered in the consolidated case.

3. Indeed, Acme's position in this Court is that the Prime Lease was renewed. Brief for Appellee, Acme Markets, Inc. at 17.

lease to which the supermarket premises were subject, Acme assigned all of its interest in the Sublease to Alameda, and Alameda agreed to assume all of Acme's obligations, if any, under the Sublease, and to hold Acme harmless under the Sublease after the termination of the Prime Lease.

Eventually, following some confusion concerning the rent paid by Beckenheimer's and after a "standstill" agreement had been effected, Alameda brought the subject declaratory judgment and injunction action.[4] The principal theory alleged in Alameda's complaint is that the Lease Termination Agreement terminated the Sublease. Acme intervened as a plaintiff, seeking a declaration that the Sublease expired for want of an effective renewal.

Alameda moved for summary judgment, and that motion was referred to the General Master of the Circuit Court for Baltimore City for report and recommendation. The master recommended that the adjudication sought by Alameda be entered on summary judgment. Beckenheimer's excepted to the master's report, and the matter was heard by the court on exceptions.

Of four issues which had been identified by the master, the circuit court concluded that its rulings on two issues furnished grounds for granting Alameda's motion. The court permanently enjoined Beckenheimer's from occupying the supermarket premises at the Shopping Center, but, upon the posting of a bond, the court stayed that injunction pending this appeal.

One ground on which the circuit court relied, as reflected in the injunction order, is "that Beckenheimer's failed to renew the Sublease in accordance with its terms." The second ground recited in the injunction order for granting Alameda's motion for summary judgment is "that the [S]ub-

---

4. In addition to Beckenheimer's, Alameda also joined as defendants B. Green, Millman–Green Venture d/b/a Farm Fresh Supermarkets, and Farm Fresh Supermarkets of Maryland, Inc. For the sake of simplicity we shall refer only to Beckenheimer's.

lease, by itself, does not confer on Beckenheimer's a right to renew the primary lease or to compel Acme to renew it for the benefit of Beckenheimer's." [5]

Beckenheimer's appealed to the Court of Special Appeals. We granted certiorari on our own motion prior to consideration of the case by that court.

Beckenheimer's contends that its notice of renewal was timely and effective and that equity can relieve from a failure strictly to comply with all of the provisions for renewal. Acme and Alameda view each of the renewal provisions as conditions with which Beckenheimer's must strictly comply. They further deny that equity can give Beckenheimer's any relief, because Beckenheimer's has not demonstrated any substantial, irreparable injury.

## I

Beckenheimer's did not cause Acme to have in hand on or before May 4, 1989, a notice of renewal that strictly complied with the Sublease's renewal provisions. To determine whether Maryland equity can assist Beckenheimer's we must first determine precisely what deficiencies taint the attempted renewal. The appellees say that Beckenheimer's did not act within the time required by the Sublease. This argument, more precisely, is that the letter of April 26

---

5. Alameda had also sought summary judgment on the ground that the Lease Termination Agreement operated to terminate the Sublease, but the circuit court found the Lease Termination Agreement "to be susceptible to more than one interpretation," and it denied summary judgment on that ground. The circuit court also would not predicate summary judgment on the ground that Beckenheimer's had defaulted by failing to pay rent when due. Although Alameda attempts in its brief in this Court to resurrect its argument based on the Lease Termination Agreement, an appellate court's review of the grant of a motion for summary judgment is ordinarily limited to the grounds assigned by the trial court. *See Federated Dep't Stores, Inc. v. Le,* 324 Md. 71, 79, 595 A.2d 1067, 1071 (1991); *Boyer v. State,* 323 Md. 558, 588, 594 A.2d 121, 136 (1991); *Orkin v. Holy Cross Hosp.,* 318 Md. 429, 435, 569 A.2d 207, 210 (1990); *Three Garden Village Ltd. Partnership v. United States Fidelity & Guar. Co.,* 318 Md. 98, 107–08, 567 A.2d 85, 89 (1989).

should not be considered to have any effect, not because it was untimely, but because it did not comply with certain conditions for renewal, other than timeliness. Between them, the appellees argue three defects: (A) that the notice timely received by Acme was really an attempted renewal by B. Green; (B) that the notice timely received by Acme did not include any statement of net worth; and (C) that Beckenheimer's never has submitted any net worth statement certified by an independent public accountant.

### A

Alameda advances two reasons why the letter of April 26 should be read as an attempt by B. Green to exercise the option. First, the letter is on the letterhead of B. Green while the author is not otherwise identified. Second, the letter of May 4 from Beckenheimer's to Acme indicates that the mistaken, subjective belief of the author of the April 26 letter was that the Sublease was held by B. Green. Neither reason supports summary judgment.

The exercise of the option to renew should be viewed much like the formation of a contract. The option is a continuing offer by Acme which may be accepted by complying with the conditions of the offer. The April 26 letter clearly manifests an intent to accept that offer. The letter specifically refers to the Sublease between Acme and Beckenheimer's. It is addressed to the sublessor. Acme knows that the sublessee is Beckenheimer's. And, indeed, an Acme representative pointed out that Beckenheimer's was the sublessee in a discussion with a representative of Beckenheimer's had after receipt of the April 26 letter and prior to the mailing by Beckenheimer's of its May 4 letter. The objective, reasonable interpretation of the April 26 letter is that it is an acceptance by the legal owner of the Sublease.

On the other hand, to construe the April 26 letter as written on behalf of B. Green, because of the letterhead, as Alameda contends, is an unreasonable interpretation. It ignores the clear manifestation of intent to accept the offer

to renew. The argument seeks to attribute the renewal to an entity which is not a party to the Sublease and is not the optionee.

█ Because the reasonable, objective interpretation of the April 26 letter is that Beckenheimer's, the sublessee, was exercising the option, it is irrelevant whether the author of the April 26 letter harbored, at the time it was written, a mistaken subjective intent as to the ownership of the sublessee's interest. A party's intention will be held to be what a reasonable person in the position of the other party would conclude the manifestations to mean. *Sands v. Sands*, 252 Md. 137, 143, 249 A.2d 187, 191 (1969); *Slice v. Carozza Properties, Inc.*, 215 Md. 357, 368, 137 A.2d 687, 693 (1958); *Ray v. William G. Eurice & Bros., Inc.*, 201 Md. 115, 127, 93 A.2d 272, 279 (1952).

█ Appellees' argument can be tested by reversing the direction of the action. Assume that, after receipt by Acme of the April 26 letter, Beckenheimer's vacated the premises, and Acme was suing Beckenheimer's to enforce an allegedly renewed lease. Further assume that Beckenheimer's moves for summary judgment on the ground that it thought that B. Green held the sublease and that an attempted renewal by B. Green was of no legal effect. Summary judgment for Beckenheimer's would be denied. The renewal letter identifies the sublease being renewed by its date, by the parties to it, namely, Acme and Beckenheimer's, and by the original prime landlords. The first name salutation of Acme's Director of Real Estate, used by the head of real estate for B. Green and its subsidiaries, raises an inference of prior dealings and familiarity between the real estate arms of the two organizations. Were a trier of fact to find, in the hypothetical, that a reasonable person in the position of Acme objectively would conclude that it was Beckenheimer's that was renewing by the April 26 letter, there would be sufficient evidence to support that conclusion.

## B

The second notice deficiency argued by the appellees is factually correct, namely, that Beckenheimer's did not submit any statement of net worth with the April 26 letter. The balance sheet included in the fiscal 1988 federal income tax return was received by Acme fifteen days into the 120 day notice period.

## C

The certification by the president of Beckenheimer's to the balance sheet in the tax return must be considered, in the present posture of the case, as the type of certification referred to in the renewal provision of the Sublease, for two reasons.

First, "the most recent certified financial statements of Sublessee," as used in the renewal paragraph of the Sublease, is ambiguous. What constitutes certification of the net worth statement is not spelled out in the Sublease. The Prime Lease does not require any statement of net worth for the tenant to exercise rights of renewal, so that the incorporation into the Sublease of nonconflicting provisions of the Prime Lease is of no assistance.

The ambiguity is highlighted by comparison to provisions of the Prime Lease dealing with the annual statement of gross sales for the purpose of calculating percentage rent. As originally drafted, the Prime Lease required Acme to furnish the Pistorios "a statement supporting [the percentage] rental payment certified to as correct by Tenant's Accounting Department." This is consistent with the general practice described in M. Friedman, *Friedman on Leases* § 6.5, at 216 (3d ed. 1990). The author states that percentage leases "generally require an annual statement, prepared by a public accountant, often one specializing in the tenant's type of business, and verified by the tenant or an executive officer if the tenant is a corporation." *Id.* The three-party Consent Agreement of November 1982, on the other hand, provides that the annual statements of

gross sales "shall be signed and certified as true and correct by an independent certified public accountant." Given two competing constructions of "certified," and absent any evidence as to which party drafted the renewal provisions, the ambiguity should be construed against the movant for summary judgment.

■ In any event, even if the Consent Agreement version of "certified," as applied to gross sales statements, should be read into the Sublease renewal provisions, the inference most favorable to Beckenheimer's on the present record is that certification by an independent accountant was waived as to the gross sales statement. When submitting the tax return balance sheet as the statement of net worth, the president of Beckenheimer's advised that the "last certified [*i.e.,* by a CPA] financial statement of Beckenheimer's, Inc. is as of December 28, 1985." The inference is that in 1986, and for each lease year thereafter, up to the renewal effort, Beckenheimer's had not utilized independent accountants and had not been submitting independently certified gross rent statements. This inference is reinforced by the absence of any contention by Acme, based on an alleged failure to submit certified gross sales statements, that Beckenheimer's failed to meet the condition of renewal that it not be in default under the Sublease at the time of renewal.

■ Based on the foregoing review, the issue before us may now be stated. It is:

Where Acme had received a timely notice advising that the subtenant renewed the Sublease, but not including any net worth statement, and where Acme, fifteen days after it was due, was in receipt of a net worth statement demonstrating the eligibility of Beckenheimer's to exercise the right of renewal, may a Maryland circuit court order Acme to perform its covenant to renew the Sublease?

## II

To apply the equitable principles invoked by Beckenheimer's we look at Acme's covenant to renew as if Beckenheimer's were seeking specifically to enforce that covenant. Essentially, Beckenheimer's contends that equity would enforce the renewal covenant in the circumstances here because, under the renewal provisions of the Sublease, time is not of the essence in furnishing the certified financial statement.

All of the parties cite *Foard v. Snider*, 205 Md. 435, 109 A.2d 101 (1954), a case involving a pure option for the purchase of real estate. In discussing whether the optionee had exercised the option within the specified period, Judge (later Chief Judge) Hammond said for the Court:

"Time is of the essence in a unilateral contract, such as an option, both in law and in equity, whether expressly declared to be so or not. Each such agreement must be scrutinized to see what it requires to be done within the specified time, either expressly or by necessary implication. Does it require completed performance, that is, actual payment, or does it require tender of the agreed price? Generally, there is contemplated only a notice of acceptance of, and a readiness and willingness to perform, the irrevocable offer which is an option. Whatever the option requires must be done. As in the case of all offers, revocable or irrevocable, the exercise must be unconditional and in exact accord with the terms of the option."

*Id.* at 446, 109 A.2d at 105–06 (citations omitted).

*Foard* cited to *Maughlin v. Perry*, 35 Md. 352 (1872), which illustrates the approach of equity where an option to purchase leased premises was included in a commercial lease. The lease was for three years, renewable for another three years. The landlord covenanted to " 'sell and convey' " the premises " 'for the sum of $1,500, at any time before the expiration of this lease or tenancy.' " *Id.* at 356. Early in the renewal term the landlord sold the reversion to

the defendant who had constructive notice of the recorded lease. Six days before the expiration of the renewal term the tenants brought an action for specific performance, averring exercise of the option. This Court held that the action would lie, that the option had been timely exercised, and that it was not necessary for the tenant-optionee to have tendered the purchase price. Under the contract there involved the time within which the tenant was bound to make his election was material, but it was appropriate to invoke equity without payment of the price. *Id.* at 360.

In explaining this result this Court quoted from *Story's Equity* §§ 775–776, in part as follows:

" '[W]here the terms of an agreement have not been strictly complied with, or are incapable of being strictly complied with, still, if there has not been gross negligence in the party, and it is conscientious that the agreement should be performed, and if compensation may be made for an injury occasioned by non-compliance with the strict terms in all such cases Courts of Equity will interfere and decree a specific performance. For the doctrine of Courts of Equity is not forfeiture, but compensation, and nothing but such a decree will, in such cases, do entire justice between the parties.' "

*Id.* at 358–59.

The Court was careful to point out the following limitation:

"We do not understand that [Courts of Equity] will go to the extent of changing the contract the parties have chosen to make, but they will carry out and perfect their contracts according to the real intention of the parties under any given state of circumstances that may arise, independent of any narrow and technical rules of construction."

*Id.* at 359.

By way of contrast is *Coleman v. Applegarth*, 68 Md. 21, 11 A. 284 (1887). There the optionee under a pure option to purchase realty had done nothing at all to exercise the

option by the specified date. Thereafter the optionor sold the property to a third party, only to be sued for specific performance by the optionee who claimed an oral extension of the option. Dismissal by the trial court was affirmed. Chief Judge Alvey, writing for this Court, said:

"Here, time was of the very essence of the agreement, the nominal consideration being paid to the owner for holding the property for the specified time, subject to the right of the plaintiff to exercise his option whether he would buy it or not. When the time limited expired, the contract was at an end, and the right of option gone...."

*Id.* at 28, 11 A. at 286.

Applying these principles to the facts before us reflects that receipt by Acme of a certified financial statement at least 120 days before the expiration of the Prime Lease was not of the essence of the covenant to renew. Acme had received a timely notice of the sublessee's intent to renew. The purpose of that notice is to inform the lessor, in advance of the expiration of the term, whether or not the lessee will continue in occupancy, thereby reducing the risk that the premises will remain vacant during efforts at reletting. *Berkow v. Hammer,* 189 Va. 489, 495, 53 S.E.2d 1, 4 (1949). The requirement that the net worth of Beckenheimer's be at least equal to its net worth when the Sublease was first made was a condition of renewal. It protects Acme from being obliged to renew to a sublessee who is currently less creditworthy than when credit was first extended. The sublease provision calling for a certified financial statement to accompany the notice is simply evidentiary. It is for the convenience of the sublessor, to assist in determining whether or not the sublessee remains creditworthy. But, under the Sublease, the certified financial statement submitted by the sublessee is not made conclusive of net worth. The sublessor may demonstrate from other information that the required net worth has not been met.

The certification by the president of Beckenheimer's, received by Acme over 100 days before the expiration of the

Prime Lease, generates a strong inference that the net worth of Beckenheimer's had increased substantially after 1982. Thus, the essence of the net worth requirement, in fact, was satisfied as of the time Beckenheimer's exercised the option. Acme, however, was put to the trouble of writing the letter of May 5, 1989, which pointed out the absence of a financial statement enclosed with the option to renew. The inconvenience to which Acme was put can be compensated. Equity would not give the requirement for including a certified financial statement with the notice of renewal a narrow and technical construction. Under the facts here, equity would not view the timing of receipt of that statement as of the essence, just as a tender of price is not always of the essence in exercising an option. Phrased another way, under the facts here, equity, in its discretion, could grant specific performance of the option to renew.

■ The foregoing discussion has been in terms of the power of equity, because that is the way in which Beckenheimer's has argued its position. A more modern expression of the concepts relied upon above is that the particular provision for including a certified financial statement with the notice of renewal is a covenant and not a condition. There are at least three express conditions in the renewal paragraph. They are introduced by the language "provided[,] as a precondition to the exercise of each Renewal Term." The first is that the "Sublessee shall have given Sublessor" notice of renewal 120 days before expiration of the Prime Lease. That condition has been satisfied. The second is that Beckenheimer's is not in default. That is not an issue before us. The third is that "the net worth of Sublessee on the date of such notice ... is at least equal to the net worth of Sublessee on the date hereof." The appellees' position is that the parenthetical language "(as evidenced by the most recent certified financial statements of Sublessee which shall be included with such notice)" is also a condition.

The financial fact—the actual net worth—is the express condition of Acme's contractual duty to renew. The re-

quirement of statement inclusion is separated from the condition by parentheses. The use of parentheses contrasts the economic fact with the way in which Beckenheimer's is to furnish evidence of the economic fact. The parenthetical material accomplishes two objectives. First, it makes clear that Beckenheimer's need not cause to be prepared a statement of net worth as of the date of notice of renewal. That would be a most challenging task, particularly since another provision of the Sublease deems a notice not to have been given to the sublessor until it is received. Rather, "the most recent certified financial statements" will do. This portion of the parenthetical material is definitional, and it is for the benefit of the sublessee.

Second, the sublessee promises to include the statement with the notice. The language "which shall be included with such notice" should not be read as an express condition. It is part of the same parenthetical material that includes the clearly non-conditional definition of net worth on the date of the renewal notice.

This interpretation of the parenthetical material comports with the preference for covenants over conditions expressed in Restatement (Second) of Contracts § 227(2) (1981). The Sublease is a bilateral contract, which contains an option. Acme is the obligor of the covenant to renew. Whether the most recent financial statement of Beckenheimer's is included with the notice to renew is an event within the control of Beckenheimer's. Under these circumstances § 227(2) recommends the following approach:

> "Unless the contract is of a type under which only one party generally undertakes duties, when it is doubtful whether
>
> (a) a duty is imposed on an obligee that an event occur, or
>
> (b) the event is made a condition of the obligor's duty, or
>
> (c) the event is made a condition of the obligor's duty and a duty is imposed on the obligee that the event occur,

the first interpretation is preferred if the event is within the obligee's control."

The preference is explained in comment *d.*

"*Condition or duty.* When an obligor wants the obligee to do an act, the obligor may make his own duty conditional on the obligee doing it and may also have the obligee promise to do it. Or he may merely make his own duty conditional on the obligee doing it. Or he may merely have the obligee promise to do it. ... It may not be clear, however, which he has done. The rule in Subsection (2) states a preference for an interpretation that merely imposes a duty on the obligee to do the act and does not make the doing of the act a condition of the obligor's duty. The preferred interpretation avoids the harsh results that might otherwise result from the non-occurrence of a condition and still gives adequate protection to the obligor under the rules ... relating to performances to be exchanged under an exchange of promises. Under those rules ... the obligee's failure to perform his duty has, if it is material, the effect of the non-occurrence of a condition of the obligor's duty. Unless the agreement makes it clear that the event is required as a condition, it is fairer to apply these more flexible rules. The obligor will, in any case, have a remedy for breach."

The breach by Beckenheimer's of the covenant to include a financial statement with the notice of renewal is not a material breach. Seemingly, only nominal damages are involved as compensation for the breach.[6] Inasmuch as the three express conditions precedent to Acme's contractual

---

**6.** Nor is this insubstantial breach a "default" within the meaning of the second express condition in the renewal paragraph of the Sublease. "Default" must be read in connection with provisions of the Prime Lease, incorporated into the Sublease, which, with respect to breaches of covenant other than of that to pay rent, deal with notice of the breach and with opportunity to cure within fifteen days. The certified financial statement of Beckenheimer's was received by Acme within fifteen days of Acme's letter of May 5, 1989, which pointed out the failure to include a statement of net worth.

duty to renew have been fulfilled, equity could specifically enforce the covenant to renew.[7]

### III

The circuit court also granted summary judgment in favor of Alameda on the additional ground "that the [S]ublease, by itself, does not confer on Beckenheimer's a right to renew the primary lease or to compel Acme to renew it for the benefit of Beckenheimer's." There is direct evidence that Acme sent, and Alameda received, a timely letter that exercised Acme's option to renew the Prime Lease, independently of any claimed power of Beckenheimer's so to act. Thus, any dispute about whether Beckenheimer's could compel Acme to renew the Prime Lease or whether Beckenheimer's could renew the Prime Lease is not material to this motion for summary judgment.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS. COSTS TO BE DIVIDED EQUALLY BETWEEN THE APPELLEES, ALAMEDA ASSOCIATES LIMITED PARTNERSHIP AND ACME MARKETS, INC.

---

7. This holding makes it unnecessary for us to consider the additional argument by Beckenheimer's that equity could give relief even if the notice of renewal had not been timely. See generally Annotation, *Circumstances Excusing Lessee's Failure to Give Timely Notice of Exercise of Option to Renew or Extend Lease*, 27 A.L.R.4th 266 (1984).