**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

THE SPORTS AUTHORITY,
INCORPORATED,
Plaintiff-Appellant,

v.

CHESAPEAKE ASSOCIATES; RICHARD'S
CLOTHING & SPORTING GOODS,
INCORPORATED, a/k/a Dick's Clothing
& Sporting Goods, Incorporated,
Defendants-Appellees.

No. 97-1833

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, District Judge.
(CA-97-830-S)

Argued: January 28, 1998

Decided: May 12, 1998

Before LUTTIG and MICHAEL, Circuit Judges, and
GOODWIN, United States District Judge
for the Southern District of West Virginia,
sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Arthur Friend Fergenson, BALLARD, SPAHR,
ANDREWS & INGERSOLL, Baltimore, Maryland, for Appellant.

Geoffrey Robert Garinther, VENABLE, BAETJER & HOWARD, L.L.P., Baltimore, Maryland, for Appellees. **ON BRIEF:** Robert A. Scott, BALLARD, SPAHR, ANDREWS & INGERSOLL, Baltimore, Maryland, for Appellant. Gail Brashers-Krug, VENABLE, BAETJER & HOWARD, L.L.P., Baltimore, Maryland, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

## OPINION

PER CURIAM:

The Sports Authority, Inc. (TSA) appeals from a final judgment entered by the district court after a bench trial in a breach of contract case. TSA asserts that it formed an enforceable contract with Chesapeake Associates (Chesapeake) to purchase property either on or before February 14, 1997, or alternatively, on February 25, 1997. The district court ruled that no contract had been formed on or before February 14 and that the statute of frauds would bar enforcement of any contract formed on February 25. Alternatively, the district court ruled that if the parties did form a contract on February 25, 1997, they abandoned it three days later. We review the district court's findings of fact for clear error and its conclusions of law de novo. Hendricks v. Central Reserve Life Insurance Co., 39 F.3d 507, 512 (4th Cir. 1994). Because the district court's findings of fact are not clearly erroneous and its conclusions of law are correct, we affirm.

I. Background

This case arises out of TSA's efforts to purchase property for one of its retail stores in a shopping center developed by Chesapeake Associates. In July 1996, TSA and Chesapeake entered into a letter of intent for the sale of the property for $1.7 million. However, negotiations proceeded at a snail's pace throughout the remainder of 1996

2

and into early 1997. As part of their negotiations, the parties hammered out drafts of three documents: (1) a Purchase and Sale Agreement (Purchase Agreement), which constituted the primary contract for the sale of the property; (2) a Site Development Agreement, which addressed Chesapeake's obligations to prepare the site for construction by TSA; and (3) an Operation and Easement Agreement (OEA), which contained various covenants governing the relationship between retailers in the shopping center.[1] The OEA required the agreement not only of TSA and Chesapeake, but also of other retailers in the shopping center, such as Giant Foods.

By January 20, 1997, closing seemed imminent. After losing money in the prolonged negotiations, Chesapeake attempted to expedite the closing in three ways. First, Robert Gothier, Sr., the managing general partner for Chesapeake, executed a deed for the sale of the property on January 20 and placed a copy of the deed in escrow with Chicago Title Insurance Company. Second, Mr. Gothier executed free-standing signature pages on January 22, which apparently were to be attached to the three documents under negotiation in the event of an agreement between the parties. Mr. Gothier forwarded the signature pages to Theresa McLaughlin, one of TSA's attorneys. Ms. McLaughlin agreed to "hold the signed pages in escrow until authorized by Pete Paturzo [a general partner for Chesapeake] . . . to release same." JA 812. Finally, on January 22, Chesapeake's three general partners each signed an affidavit (Partnership Affidavit) stating that the Purchase and Sale Agreement had been "duly executed and delivered" and was "valid and binding." JA 1483-86. The partners forwarded the affidavit to Chicago Title to hold for closing.

On February 7, 1997, Nicholas Milano, another of TSA's attorneys (and Ms. McLaughlin's subordinate on the transaction), forwarded the executed signature pages to Chicago Title in anticipation of closing. In his accompanying letter, Mr. Milano stated: "These documents are to be held in escrow. Do not disburse or take any action until it is con-

_____

[1] The parties also refer to the Operation and Easement Agreement as the Reciprocal Easement and Operation Agreement (REA). We will utilize the term "OEA" in referring to this document, except where we quote from documentary evidence that uses the "REA" designation.

3

firmed by me in writing that you are authorized to do so." JA 964. Mr. Milano claims that he did this at Pete Paturzo's instruction.

Although TSA and Chesapeake were making progress, TSA and Giant Foods could not reach an agreement on the OEA because of a dispute over the issue of sidewalk sales. TSA refused to sign the OEA unless the OEA contained a provision prohibiting the parties to the OEA from having sidewalk sales. Giant Foods refused to agree to this condition. At first glance, this dispute might seem like a minor one; representatives of TSA, however, clearly did not view the sidewalk sales issue as minor. In fact, Len Weiselberg of TSA told Pete Paturzo of Chesapeake on February 13 or 14 that the deal was"dead" because of the failure to reach an agreement on this issue. Shortly thereafter, Chesapeake began negotiations with Dick's Sporting Goods for sale of the property.

However, sometime between February 22 and 25, TSA and Chesapeake resumed negotiations after Mr. Weiselberg informed Mr. Paturzo of local zoning ordinances that TSA believed would prevent Giant from conducting sidewalk sales. The parties dispute whether, during a conversation on February 25, they orally agreed to close the transaction on March 4; regardless, TSA's lawyers proceeded to set a March 4 closing date.

In the meantime, Mr. Gothier of Chesapeake reached an oral agreement with Dick's Sporting Goods on February 28 to sell the property for $200,000 more than TSA had offered to pay. Mr. Gothier contacted Mr. Weiselberg and demanded an additional $250,000 for the property. For a second time, Mr. Weiselberg told Mr. Gothier that the deal was "dead" and that Chesapeake could sell its property elsewhere. Although Mr. Weiselberg did not write a letter to that effect or return the signature pages, Mr. Gothier did write a letter to Mr. Weiselberg confirming that the deal was dead. On March 7, however, TSA demanded performance under the Purchase Agreement, which led to the filing of the instant suit.

II. Discussion

TSA challenges the district court's conclusion that Chesapeake and TSA did not enter into a binding contract before February 14, 1997.

4

TSA argues that execution of the deed, signature pages, and Partnership Affidavit clearly constituted an objective manifestation of Chesapeake's intent to be bound by the draft purchase agreement. TSA also argues that the dispute over sidewalk sales involved a condition precedent to TSA's performance, not a material contractual term that would indicate the absence of a meeting of the minds. We find that the district court's conclusion that Chesapeake and TSA did not enter into a binding contract before February 14, 1997, is not clearly erroneous. First, there is ample evidence to support the district court's finding that there was no meeting of the minds before February 14, 1997. Second, there is ample evidence to support the district court's finding that the deed, signature pages, and Partnership Affidavit were executed in anticipation of an agreement expected to be reached in the future, not an agreement that had already been reached. Third, there is ample evidence to support the district court's finding that the issue of sidewalk sales concerned a material contractual term, not a condition precedent. Accordingly, we affirm.

Under Maryland law, "one of the essential elements for formation of a contract is a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms." Safeway Stores, Inc. v. Altman, 296 Md. 486, 489, 463 A.2d 829, 831 (1983) (citations and internal quotations omitted). Conversely, "[t]he failure to agree on . . . an essential term of a contract may indicate that the mutual assent required to make . . . a contract is lacking." Klein v. Weiss, 284 Md. 36, 63, 395 A.2d 126, 141 (1978) (citations omitted). "It is essential that the minds of the parties be in agreement on terms in order for a contract to be established." Marmott v. Maryland Lumber Co., 807 F.2d 1180, 1184 (4th Cir. 1986) (citing Klein v. Weiss, 284 Md. 36, 395 A.2d 126, 141 (1978)), cert. denied, 482 U.S. 929 (1987).

The district court determined that the OEA embodied material contractual terms, and reasoned that without the parties' agreement on the OEA, "there could be no meeting of the minds for the sale of this property." JA 501. After considering the evidence adduced at the bench trial, the district court found that the parties had not reached an agreement on the OEA until February 25th at the earliest. Voluminous evidence in the record supports the district court's finding. We

5

need not review all such evidence here because two components of this evidence adequately depict the negotiation and revision process that persisted through January and most of February.

First, the time sheets and billing summaries of Theresa McLaughlin and Nicholas Milano, TSA's attorneys, demonstrate the parties' difficulties in reaching an agreement. Excerpts of Ms. McLaughlin's and Mr. Milano's time sheets and billing summaries appear below:

> January 3, 1997 -- [Theresa McLaughlin] "Extensive revisions to OEA; work on exhibits; numerous and extensive telephone conferences with all parties re due diligence, OEA and closing documents; draft memo re OEA." JA 1509.

> January 4, 1997 -- [Theresa McLaughlin]"Work on exhibits to OEA; work on site development agreement revisions; work on purchase agreement revisions . . . ." JA 1509.

> January 7, 1997 -- [Theresa McLaughlin]"Numerous telephone conferences with all parties re revisions to OEA . . . ." JA 1509.

> January 10, 1997 -- [Theresa McLaughlin] ". . . work on issues related to OEA." JA 1510.

> January 14, 1997 -- [Theresa McLaughlin] ". . . telephone conference with Bob Cherry re revisions to OEA." JA 1510.

> January 17, 1997 -- [Theresa McLaughlin] "Telephone conference with Pete Paturzo re status of agreements. . . ." JA 1511.

> January 21, 1997 -- [Theresa McLaughlin] "Work on OEA issues; numerous telephone conferences with Pete Paturzo re open issues; draft letter re revised agreements .. . ." JA 1511.

> January 23, 1997 -- [Theresa McLaughlin] "Numerous and extensive work on finalizing OEA, and other exhibits. . . ." JA 1512.

6

January 24, 1997 -- [Theresa McLaughlin] "Extensive work on issues relating to wetlands; numerous and extensive telephone conferences with developer, Maryland attorney and others re same; work on OEA revisions . . . ." JA 1512.

January 25, 1997 -- [Theresa McLaughlin] "Revise OEA, purchase agreement and site development agreement; work on title and survey issues; work on all exhibits to all agreements; draft letters to all parties re same; mark up OEA for comment to Bob Cherry." JA 1512.

January 29, 1997 -- [Nicholas Milano]"Extensive work finalizing Purchasing Agreement with clarification of Exhibit A the legal description, Exhibit B-1 permitted exceptions, need for finalization of OEA to be attached as exhibit, . . . . Telephone call to all parties to remind them of time frame and need for comments especially those of Bob Cherry from Giant." JA 1513.

January 30, 1997 -- [Nicholas Milano]"Review the comments of Mr. Sax, revise the OEA to reflect these comments." JA 1386, 1513.

January 31, 1997 -- [Nicholas Milano]"Telephone call from Pete Paturzo and Bob Gothier of RVG. They provided me with extensive list of comments from Giant and RVG to the OEA." JA 1387, 1514.

February 3, 1997 -- [Theresa McLaughlin] "Work on matters relating to OEA; telephone conference with Len Weiselberg re numerous issues; work on insurance issues; telephone conference with Peter Cook re insurance issues in OEA." JA 1514.

February 3, 1997 -- [Nicholas Milano]"Telephone call with Pete Paturzo, developer on the property and review thirteen objections from Giant to the OEA. Narrow objections and inform him that we cannot insert any provisions that the lease will dominate the OEA. Telephone call with Len Weiselberg of TSA." JA 1514.

7

February 4, 1997 -- [Nicholas Milano]"Return call to Pete Paturzo informing him that TSA cannot agree to a provision allowing the lease to rule the OEA. Certain items still remain to be resolved." JA 1388, 1514.

February 6, 1997 -- [Nicholas Milano]"Continued negotiations of OEA." JA 1390, 1515.

February 7, 1997 -- [Theresa McLaughlin] "Work on issues concerning closing statement, OEA and other matters." JA 1515.

February 7, 1997 -- [Nicholas Milano]"Continue revision to the OEA after discussions with Pete Paturzo." JA 1391, 1515.

February 10, 1997 -- [Nicholas Milano] "Telephone call from Ann Kemp Esq. Attorney at Nations to inform her of pending changes to OEA. Telephone call with Pete Paturzo [redacted] to clarify 4 remaining issues for final agreement on the OEA." JA 1392, 1515.

February 11, 1997 -- [Theresa McLaughlin] "Review numerous revisions to REA; telephone conference with client re same." JA 1515.

February 11, 1997 -- [Nicholas Milano]"Continued revisions to OEA for closing. . . . . Telephone call to Lee Sax to inform him that changes are occurring to the OEA and need for his client's approval." JA 1393, 1516.

February 12, 1997 -- [Theresa McLaughlin] "Numerous conferences with client re OEA revisions; review revisions to OEA." JA 1516.

February 12, 1997 -- [Nicholas Milano]"Letter from Bill Cherry demanded final wording to be inserted in the OEA. Discuss [redacted] with Len Weiselberg and send to Debbie Stear. This mandate is the only way in which Giant will sign

8

OEA. . . . Conference call from Bob Gothier and Pete Paturzo regarding their requirement to have new documents sent to them before closing for review. Prepare new final documents and have sent to Chicago Title, Dave Carey, Esq. and Bob Gothier. Telephone call from Lee Sax, Esq., regarding his problems with pending changes." JA 1394, 1516.

February 14, 1997 -- [Nicholas Milano]"Telephone call to Pete Paturzo Re: last issue involving cash registers. . . . Telephone call to Cathy Jenkins re: her forwarding a copy of all signature pages to this office and review of documents she has." JA 1396, 1517.

February 21, 1997 -- [Nicholas Milano]"Draft letter requesting return of all closing documents sent to CTIC in escrow. Telephone call to Cathy Jenkins, Esq. reading this issue. Return call from Cathy Re; OEA document. Send followup letter demanding return of this document." JA 1398.

Second, Len Weiselberg, TSA's Real Estate Manager, testified that the parties' difficulties in reaching an agreement resulted in the breakdown of negotiations on February 14, 1997.[2]

In light of the parties' obvious, and abundant, difficulties in reaching an agreement on material contractual terms, the district court was not clearly erroneous in finding that Chesapeake's January 22, 1997, execution, and placement into escrow, of a deed, free-standing signature pages, and Partnership Affidavit, did not represent objective manifestations of Chesapeake's intent to enter into a binding contract on that date.[3] In Maryland, as in other jurisdictions, the test of con-

_____

[2] Mr. Weiselberg testified that TSA's senior management was concerned about the OEA's sidewalk sales provision, and that the parties could not agree on it as of the evening of February 13, 1997. JA 339. Mr. Weiselberg also testified that on February 14, 1997, he had a telephone conversation with Pete Paturzo of Chesapeake, in which he informed Mr. Paturzo that "we cannot go forward with this transaction . . . the deal is dead." JA 340.

[3] January 22, 1997, represents the date by which all three of these instruments had been executed and transferred either to Chicago Title or TSA's attorneys.

9

tract formation is objective, but it is not abstract. "A party's intention will be held to be what a reasonable person in the position of the other party would conclude the manifestations to mean." Beckenheimer's Inc. v. Alameda Assoc. Ltd. Partnership, 327 Md. 536, 547, 611 A.2d 105, 110 (1992) (citations omitted); Slice v. Carozza Properties, Inc., 215 Md. 357, 368, 137 A.2d 687, 693 (1958) (citations omitted); Ray v. William G. Eurice & Bros., Inc., 201 Md. 115, 127, 93 A.2d 272, 279 (1952) (citations omitted).

As illustrated above, the evidence adduced before the district court showed that the parties were still negotiating the terms of the Purchase Agreement on January 22. Therefore, when the deed, signature pages, and Partnership Affidavit were executed and placed in escrow, the Purchase Agreement itself was not even finalized.[4] Furthermore, evidence adduced before the district court showed that TSA's attorneys understood that Chesapeake's execution of the documents represented a time-saving device rather than an indication that negotiations had been finalized. Ms. McLaughlin and Mr. Milano both testified that Chesapeake executed the signature pages and placed them into escrow in order to expedite the closing; that is, in order "to save a day or so." JA 274-76; 44-45. Thus, they continued to "revise" and "finalize" the Purchase Agreement after Chesapeake's January 22 actions.[5] Having found that the parties continued to negotiate and revise material contractual terms throughout January and most of February, the district court was not clearly erroneous in finding that Chesapeake's

_____

[4] On January 25, 1997, for example, Ms. McLaughlin faxed a "revised Purchase and Sale Agreement" to Dave Carey, Chesapeake's attorney. In her cover letter, Ms. McLaughlin expressed her belief that the newly revised Purchase and Sale Agreement represented its "final form." JA 842. Mr. Milano echoed this hope four days later. On January 29, 1997, after performing "[e]xtensive work finalizing [the] Purchase Agreement," JA 1513, Mr. Milano faxed a revised version of the Agreement to Chesapeake. In his handwritten cover note, Mr. Milano predicted that the further revised document represented its "final form." JA 943.

[5] Significantly, while Ms. McLaughlin's and Mr. Milano's time sheets and billing summaries include numerous references to "revising" and "finalizing" the OEA and Purchase Agreement, none of their January and February time sheets or billing summaries contains any reference to modifying or amending an existing contract.

10

January 22 execution, and placement into escrow, of free-standing signature pages, a copy of the deed, and Partnership Affidavit did not manifest its intent to be bound by the draft Purchase Agreement on that date.

Chesapeake should not have executed the Partnership Affidavit until the parties had actually reached the agreement referenced in the Affidavit. Furthermore, experienced attorneys should not have facilitated the premature execution, transmittal, and maintenance of the Affidavit. But the evidence adduced at the district court revealed that, within the context of this transaction, Chesapeake's execution of the Affidavit simply represented an attempt to expedite the closing, rather than an indication that an agreement had been reached.

TSA also argues that the dispute over sidewalk sales involved a condition precedent to TSA's performance, not a material contractual term that would indicate the absence of a meeting of the minds. As support for this argument, TSA cites language in the proposed Purchase Agreement that referred to execution of the OEA, which was to contain the sidewalk sales provision, as a condition precedent to TSA's obligation to perform under the contract. The district court did not err in concluding that the issue of sidewalk sales was a material one that prevented formation of a contract. The proposed Purchase Agreement at best is ambiguous about whether entry into the OEA was really a condition precedent. First, the third paragraph of the Purchase Agreement refers to the OEA as "a part of" the Purchase Agreement and indicates that the terms and conditions of the Purchase Agreement are "subject to" the OEA. Second, the language in the Purchase Agreement cited by TSA refers to executing the OEA at closing, not reaching agreement on the OEA, as the condition precedent. There is ample evidence that the parties viewed agreement on the OEA as material to agreement on the entire contract.

Finally, TSA argues that even if no contract was formed prior to February 14, 1997, the parties reached a new oral agreement on February 25, 1997.[6] Even if the parties did reach a new oral agreement on February 25, we agree with the district court that this agreement

_____

**6** We do not reach the issue of abandonment of the alleged February 25 contract as it is unnecessary to the disposition of this appeal.

11

would be unenforceable because of the statute of frauds. The statute of frauds provides that contracts for the sale of land are unenforceable unless they are in writing and signed by the parties to be charged. See Pyles v. Goller, 109 Md. App. 71, 88, 674 A.2d 35, 43 (Md. Ct. Spec. App. 1996). The alleged oral agreement on February 25 fails to satisfy this requirement.

However, TSA argues that its claim is not barred by the statute of frauds because it is relying on the written signature pages executed on January 22, not the oral February 25 agreement. As discussed above, no contract was formed in January. Because no contract existed, TSA may not use the January 22 signature pages to satisfy the statute of frauds for the alleged February 25 agreement. Accordingly, the judgment of the district court is affirmed.

AFFIRMED

12