780 A.2d 1193

**MARYLAND ENVIRONMENTAL TRUST**

v.

**Cathy Cook GAYNOR et al.**

**No. 1865, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Sept. 10, 2001.

434

Christine K. McSherry, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Joseph P. Gill, Principal Counsel on the brief), Annapolis, for appellant.

Warren K. Rich (Mark F. Gabler and Rich and Henderson, P.C. on the brief), Annapolis, for appellees.

Douglas G. Worrall and Wright, Constable, Skeen, LLP, Baltimore, for amicus curiae, Land Trust Alliance, Inc.

Argued before DEBORAH S. EYLER, KRAUSER and PAUL E. ALPERT (Ret., specially assigned), JJ.

PAUL E. ALPERT, Judge, Ret'd, specially assigned.

This case involves the events surrounding the establishment of an environmental easement over the property of appellees, Cathy Cook Gaynor and her husband, Kevin Gaynor. On February 11, 2000, the Gaynors filed a First Amended Complaint in the Circuit Court for Anne Arundel County against the Maryland Environmental Trust ("MET"). The Amended Complaint raised claims of fraud in the inducement; negligent misrepresentation; deceit, concealment and non-disclosure; and, sought a declaratory judgment for ultra vires action.

A court trial was held on March 15, 2000 (Silkworth, J. presiding). At the close of the Gaynors' case, the MET moved for judgment on all counts. The court granted judgment in favor of the MET on the claim for declaratory judgment for ultra vires action. The court held the remaining counts sub curia in order to render a written opinion.

In a written memorandum opinion and order dated September 12, 2000, the trial court found in favor of the Gaynors on their claim for fraud and ordered recision of the Deed of Conservation Easement and all other written and oral agreements underlying that agreement between the Gaynors and the MET. Judgment was entered in favor of the MET on the claims for negligent misrepresentation and deceit, concealment, and non-disclosure. This appeal followed.[1] Subse-

---

1. The parties failed to include in their Joint Record Extract a copy of the docket entries. Our failure to sanction the parties should not be construed as condonation of their failure to comply with the rules of appellate procedure. See Md. Rule 8–501.

quently, the Land Trust Alliance, Inc. was granted permission to file a brief as amicus curiae.

## ISSUES PRESENTED

The MET presents a single question for our review. That is, whether the trial court erred in finding that it was fraudulent in its communications with the Gaynors.

On cross-appeal, the Gaynors claim that the trial court erred in finding that Mr. Highsaw's promise to inform them of events at the MET board meeting did not create a duty of care and that the MET had no duty to disclose accurately all material facts as required by statute.

The Land Trust Alliance, Inc. asserts that rescinding a conservation easement on the evidence brought forth at trial may do irreparable harm to land conservation in Maryland. It argues that the lower court's ruling should be reversed and that the lower court should dismiss the Gaynors' complaint.

We disagree with the position asserted by the Land Trust Alliance, Inc. We shall hold that the trial court did not err in finding that the MET was fraudulent in its communications with the Gaynors. In light of our holding, we need not address the issues raised in the Gaynors' cross-appeal.

## FACTUAL BACKGROUND

The MET is a public agency governed by a Board of Trustees and operating as part of the Department of Natural Resources. Md.Code (1973, 2000 Repl.Vol.), Nat. Res. § 3–202. Its purpose is to "conserve, improve, stimulate, and perpetuate the aesthetic, natural, health and welfare, scenic, and cultural qualities of the environment, including, but not limited to land, water, air, wildlife, scenic qualities, open spaces, buildings or any interest therein, and other appurtenances pertaining in any way to the State." *Id.* § 3–201(a). One of the ways in which the MET fulfills its purpose is by accepting donated conservation easements. *See* § 3–203.1. A conservation easement is a legal agreement between a land-

owner and the MET that restricts the potential uses of the land at issue in order to prevent it from being developed for commercial or industrial uses or for housing developments. *See* Md.Code (1974, 1996 Repl.Vol.), Real Prop. § 2–118(a) and (b). In exchange for the conservation easements, the landowners qualify for certain property, income, and estate tax benefits.

The basic facts of the instant case are not in dispute. In 1989, Kevin Gaynor, who is an attorney with substantial experience in environmental matters, and his wife, Cathy Cook Gaynor, contacted the MET to inquire about donating a conservation easement on their property. They were informed that the MET normally accepts easements on property consisting of 50 acres or more. Thereafter, the Gaynors contacted several of their neighbors about donating easements simultaneously so that the aggregate acreage of the properties donated would qualify them for MET conservation easements. Several neighbors expressed interest in donating conservation easements to MET, including the Chalmers, the Servarys, and the Schumacher/Parker family.

In June 1989, Grant Dehart and Jim Highsaw of the MET had a meeting with the Gaynors and their neighbors. It is undisputed that, thereafter, Mr. Highsaw became the primary contact person from the MET and Mr. Gaynor served as the "point man" for the property owners. Negotiations occurred throughout the summer of 1989. Notwithstanding Mr. Gaynor's designation as the "point man" for communications between the group of property owners and the MET, individual easements were required for each property, and the terms of each of those easements varied.

On September 11, 1989, the properties were presented to the MET board. The board voted to accept the easements with certain conditions. The minutes of the meeting state as follows:

The Board voted to accept the easements, subject to the following conditions:

1.) The donors['] proposed dispute resolution language should be modified ...; 2.) The deeds must contain a clause to state that MET may unilaterally make the 501(c) local land trust a co-grantee ...; 3.) Staff should *ask* for a 'no subdivision' provision in the Servary deed, and also in the Gaynor and Schumacher deeds. This is most important for the Servary deed. However, the Board will accept the easements without this provision if necessary.

(Emphasis in original).

The case at hand involves the communications between Mr. Highsaw and Mr. Gaynor that followed this decision by the board. Mr. Gaynor testified that he spoke to Mr. Highsaw by telephone on September 12, 1989, and that Mr. Highsaw told him about the board meeting. Mr. Gaynor got the impression from that conversation that the board would not accept the easements unless the property owners agreed to the subdivision restriction. According to Mr. Gaynor, Mr. Highsaw told him that the board "wanted" the restriction and "felt strongly" about it. Mr. Gaynor assumed that this meant that the board required the restriction in order to accept the easements.

On September 15, 1989, Mr. Highsaw sent the following letter to Mr. Gaynor:

Dear Kevin:

As I discussed with Barbara Parker this week, our Board of Trustees agreed to accept the easement offers on the condition that the proposed dispute resolution language be changed to read *discuss the matter for 30 day* instead of *discuss referring the matter to arbitration.* The Board also advised that the deeds should contain a provision stating that MET may unilaterally make the 501(c) local land trust a co-grantee of the easements. I will have to get the exact wording to you after further discussion with a Board member.

The board requests that the owners consider adding a "no subdivision" provision to the Gaynor, Schumacher/Parker, and Servary deeds to ensure that the properties remain intact under one ownership. Because of its smaller size, the

Board especially recommends this provision for the Servary property. With such a provision, the second home site on each property could not be subdivided off and sold to a new owner as a separate lot. Please report this to each property owner, and discuss this request at your September 18th meeting and get back to me.

I will proceed with asking the Board of Public Works to ratify the easements at their October 4th meeting. In the meantime, I will need your response to the "no subdivision" provision.

(Emphasis in original).

According to Mr. Gaynor, Mr. Highsaw never specifically stated that the board would accept the easements without the subdivision restriction. Mr. Gaynor relied on the minutes of the September 11, 1989 meeting as evidence that Mr. Highsaw deceived him, because the minutes clearly state that "the Board will accept the easements without [the subdivision] provision if necessary," but Mr. Highsaw never made that statement to Mr. Gaynor orally.

Mr. Highsaw testified that he had no independent recollection of his telephone conversations with Mr. Gaynor in 1989. Mr. Highsaw drafted the minutes of the September 11, 1989 board meeting because, he testified, that was one of his duties as the staff person in attendance. Mr. Highsaw also testified that he believed that he told the property owners that the board had accepted their easements without the "no subdivision" provision and that this information was conveyed in his September 15, 1989 letter.

One of the other property owners, Barbara Parker, testified at trial that Mr. Highsaw's September 15, 1989 letter made clear that the request for a subdivision restriction was not a requirement. She testified that she remembered "looking at [the letter] and saying, look, it says that they want us to consider adding a no subdivision provision. We have considered it. We've talked about it; we've considered it. We're not going to do it." Ms. Parker was certain that she told Mr. Gaynor and the other property owners that she and her

husband would not agree to the "no subdivision" provision, and no such provision was included in the easement the Schumacher/Parker family donated to the MET.

In 1994, Mr. Gaynor joined the Board of the MET. In December 1997, he learned that his neighbors, Dale Schumacher and Barbara Parker, intended to build a second home on part of their property and that their easement to the MET did not include a subdivision restriction. This case followed.

## STANDARD OF REVIEW

Maryland Rule 8–131(c) provides:

*Action tried without a jury.*—When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

Our standard of review depends upon whether the trial judge's ruling was a finding of fact or a conclusion of law. *Himelstein v. Arrow Cab,* 113 Md.App. 530, 536, 688 A.2d 491 (1997), *aff'd,* 348 Md. 558, 705 A.2d 294 (1998). An appellate court should not substitute its judgment for that of the trial court on its findings of fact, but will only determine whether those findings are clearly erroneous in light of the total evidence. *Id.* (citing *Dorf v. Skolnik,* 280 Md. 101, 117–18, 371 A.2d 1094 (1977)); *Van Wyk, Inc. v. Fruitrade Int'l, Inc.,* 98 Md.App. 662, 669, 635 A.2d 14 (1994)(quoting *$3,417.46 U.S. Money v. Kinnamon,* 326 Md. 141, 149, 604 A.2d 64 (1992)). In contrast, the clearly erroneous standard does not apply to the trial court's determinations of legal questions or to the legal conclusions it draws from its factual findings. *Medi–Cen Corp. v. H. Robert Birschbach, M.D., Chartered,* 123 Md.App. 765, 770, 720 A.2d 966, 968 (1998); *Himelstein,* 113 Md.App. at 536, 688 A.2d 491; *Van Wyk, Inc.,* 98 Md.App. at 669, 635 A.2d 14. The appropriate standard of review in these instances is whether the trial court was legally correct. *Himelstein,* 113 Md.App. at 536, 688 A.2d 491.

## DISCUSSION

### I.

The MET contends that the trial court's ruling must be reversed because the facts presented at the trial do not show that any fraud was perpetrated on the Gaynors. Specifically, the MET contends that Highsaw's letter to the Gaynors accurately and completely outlined the board's decision and, therefore, there was no evidence that Highsaw misrepresented the board's position. While the MET argues that this is a question of law only, it is clear to us that the MET is actually disputing the trial court's factual finding that there was evidence of Mr. Highsaw's misrepresentation. That the trial court viewed the facts differently than the MET does not mean that the court's conclusions were not reasonably drawn from the evidence before it. We hold that the trial court's findings of fact are not clearly erroneous in light of the total evidence presented below. We explain.

In its memorandum opinion, the trial court correctly set forth the elements of actionable fraud as follows:

"(1) that a representation made by the respondent was false; (2) that its falsity was known to him; (3) that the misrepresentation was made for the purpose of defrauding the plaintiff; (4) that the plaintiff not only relied upon the misrepresentation, but had the right to do so and would not have done the thing from which the damage resulted if it had not been made; and (5) that the plaintiff suffered damage (meaning an injury subject to being redressed by compensatory damages) directly resulting from the respondent's misrepresentation. [Footnote omitted]. [Citations omitted]."

*Crawford v. Mindel,* 57 Md.App. 111, 119, 469 A.2d 454, 458 (1984)(quoting *James v. Weisheit,* 279 Md. 41, 44, 367 A.2d 482 (1977)). The MET does not challenge the trial court's statement of the law that, "[e]ven in the absence of a duty of disclosure, one who suppresses or conceals facts which materially qualify representations made to another may be guilty of fraud." Indeed, the trial court was legally correct in conclud-

ing that "[w]ords or acts that create a false impression by covering up the truth 'are classed as misrepresentations, no less than a verbal assurance that the fact is not true.'" (quoting W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts,* § 106 at 737 (5th ed.1984)).

The court's legal conclusion that a false statement was made is supported by the undisputed fact that Highsaw affirmatively represented to Mr. Gaynor that he would send him an outline of the board's actions. It is further supported by the undisputed fact that Mr. Highsaw sent a letter to Mr. Gaynor which, on its face, appeared to be a complete outline of the board's findings. Contrary to the MET's vigorous assertions, the trial court concluded that Mr. Highsaw's omission of a critical portion of the meeting, namely that the board was willing to accept the easements without the "no subdivision" provision, concealed the truth of what the board decided, and resulted in an incomplete and misleading representation to the Gaynors. This conclusion was clearly supported by the facts presented.

The MET reargues on appeal what it argued below, namely that Highsaw was not required to describe the board's position to the Gaynors in exactly the same terms used in the minutes. The MET asserts that Mr. Highsaw's letter was "entirely accurate and complete" and that there were no omissions of any of the details of the board's decision. We disagree. There were ample facts to support the trial court's conclusion that Mr. Highsaw's letter gave the impression of being a complete overview of the board's decision when, in fact, it concealed the truth of the board's actual decision.

Likewise, there was sufficient evidence to support the trial court's conclusion that Mr. Highsaw had knowledge of the falsity of his representation or omission. It is undisputed that Mr. Highsaw was present at the board meeting, that he prepared the minutes of the meeting, and that he authored the letter to Mr. Gaynor without including any statement about the board's willingness to accept the easements without the "no subdivision" provision. From these undisputed facts, we

conclude that the trial court did not err in finding that Mr. Highsaw knew his communications gave a false impression.

■ There is also ample evidence to support the trial court's conclusion that Mr. Highsaw's misrepresentation was made for the purpose of defrauding the Gaynors. The trial judge discounted the argument that Mr. Highsaw's failure to include in his letter information about the board's willingness to accept the easements without the "no subdivision" provision was inadvertent. The court noted the care with which Mr. Highsaw prepared the letter to the Gaynors. The judge relied on a draft of Mr. Highsaw's letter, in which the "original language conveys the unequivocal impression that the Board required the 'no subdivision' clause." The trial judge noted that Mr. Highsaw "carefully parsed through this letter, striking out the unequivocal language, and replacing it with language that gave a more ambiguous impression of whether the Board was requiring the 'no subdivision' clause, or merely asking that the neighbors ponder its inclusion." This evidence provides ample support for the trial court's conclusion that Mr. Highsaw's actions were not merely careless or inadvertent, but rather that Mr. Highsaw was fully aware of the board's September 11, 1989 decision, that he was careful and deliberate in the preparation of his letter to Mr. Gaynor, and that he was aware that his letter would give a false impression of the board's findings.

The trial court's conclusion that Mr. Highsaw's omission contained material information that the Gaynors would have relied upon is also supported by the evidence. Specifically, the court noted in its opinion Mr. Gaynor's testimony that he informed Mr. Highsaw that he did not want the "no subdivision" clause in the agreement. We give due regard to the opportunity of the trial court to judge the credibility of the witnesses. Md. Rule 8–131(c). Accordingly, we perceive no error in the court's determination on this required element of the Gaynor's claim for fraud.

Finally, we hold that there was no error in the court's determination that the inclusion of the "no subdivision" clause

deprived the Gaynors of "both the right to subdivide and the economic value of any future sale of the second lot." Mr. Highsaw testified at trial that the purpose of a conservation easement is "to prevent properties from being converted to housing subdivisions or industrial uses or commercial uses." As Mr. Highsaw testified, the deed of conservation easement clearly spells out the specific restrictions that are placed on the subject property. Accordingly, there was no error in the trial court's conclusion with respect to the relief granted.

**JUDGMENT AFFIRMED;**

**COSTS TO BE PAID BY APPELLANT.**

DEBORAH S. EYLER, Judge, dissenting.

I respectfully dissent. In my view, the facts in evidence in this case were legally insufficient to support a finding that the MET made a false representation of fact to the Gaynors, and therefore to support a finding of fraud.

The letter that Mr. Highsaw sent to Mr. Gaynor said:

The Board *requests that the owners consider* adding a "no subdivision" provision to the Gaynor, Schumacher/Parker, and Servary deeds.... Because of its smaller size, the Board especially recommends this provision for the Servary property.... Please report this to each property owners, and discuss this *request* at your September 18th meeting and get back to me.

(Emphasis supplied.) By its plain language, this letter asks Mr. Gaynor to have the owners think about adding "no subdivision" provisions to their deeds. The implicit meaning of these words is that the board wanted the owners to include such a provision in their deeds, but was not demanding that they do so—in other words, it was for the owners to decide whether they would include the "no subdivision" provision in their deeds. The words cannot reasonably be read to mean anything else. There is nothing whatsoever in the language of the letter to suggest that the owners had to agree to include the "no subdivision" provision in their deeds, or the easements would not be accepted. Thus, the letter to Mr. Gaynor fully

and accurately conveyed the precise decision made by the board at its meeting.