891 A.2d 384

**CHESAPEAKE BANK OF MARYLAND**

v.

**MONRO MUFFLER/BRAKE, INC.**

**No. 2288, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Jan. 31, 2006.

696

698

700

Robert L. Hanley, Jr., Towson, for appellant.

Howard S. Stevens, Baltimore, for appellee.

Panel: KENNEY, DEBORAH S. EYLER, WOODWARD, JJ.

KENNEY, J.

Chesapeake Bank of Maryland appeals the decision of the Circuit Court for Baltimore County granting the petition for judgment of renewal of lease agreement and for declaratory judgment filed by Monro Muffler/Brake, Inc., appellee. Chesapeake Bank of Maryland presents two questions:

1. Did the trial court err in holding that Monro's letter dated August 29, 2002 constituted an effective renewal of its lease with Chesapeake even though it was sent 27 days after the deadline specified in the Lease?

2. Did the trial court err in holding that Monro's untimely notice of renewal was a default subject to cure under the lease?

For the following reasons, we shall reverse and remand to the circuit court.

## FACTUAL AND PROCEDURAL HISTORY

In 1981, Chesapeake Bank of Maryland ("the Bank"), then doing business as Chesapeake Federal Savings and Loan Associates, leased property located at 10501 York Road in Baltimore County to Kimmel Automotive, Inc. The lease provided for a term of twenty years, to expire on October 31, 2002. It further provided:

LESSEE shall have and is hereby granted a total of 3 successive options to extend the term of this lease for any period of time not exceeding 5 years for each such option

upon the same covenants and conditions as herein provided. If LESSEE shall elect to exercise one or more of such options it shall do so by giving LESSOR written notice at least ninety (90) days prior to the expiration of the primary term or of the then current extension, and in such notice LESSEE shall state the date to which it elects to extend the term.

\* \* \*

In the event LESSEE shall default in the performance of any of the terms or provisions of this lease other than the payment of monthly rent, LESSOR shall promptly so notify LESSEE in writing. If LESSEE shall fail to cure such default within twenty days after receipt of such notice, or if the default is of such character as to require more than twenty days to cure and LESSEE shall fail to commence to do so within twenty days after receipt of such notice and thereafter deligently [sic] proceed to cure such default, then in either such event LESSOR may cure such default and such expense shall be added to the rent otherwise due, but any such default shall not work as a forfeiture of this lease.

In a letter dated March 20, 2002, Monro Muffler/Brake, Inc. ("Monro") informed the Bank that it was in the process of purchasing all the shares of Kimmel Automotive. Along with the letter, Monro sent the Bank a "landlord's estoppel certifi-- cate," which provided in part:

2. The Lease is valid, in full force and effect on the date hereof and enforceable in accordance with its terms and has not been modified or amended from the date of its execution to the date hereof, except as may otherwise be indicated in said Schedule.

3. The term of the Lease commenced on the date of commencement shown in said Schedule and will terminate, unless renewed or extended in accordance with its terms, on the date of termination shown in said Schedule.

The "Schedule" referred to in the estoppel certificate con- firmed that the termination date on the lease was October 31,

2002, and that the lessee had three options to extend the lease for terms of up to five years each. The Bank signed the estoppel certificate on April 10, 2002, and returned it to Monro as provided for in Monro's letter.

In a letter dated May 8, 2002, Monro informed the Bank that it "has finalized its purchase of all of Kimmel Tire and Tread Quarters' business." The letter, which was signed by Thomas Aspenleiter, Monro's Vice President of Real Estate, concluded: "We look forward to a long and prosperous relationship with you and we welcome any questions or comments you may have relative to this relationship." In a letter dated August 8, 2002, Monro stated that it was updating its landlord information and asked the Bank to verify its name and contact information. The Bank provided Monro with the requested information.

Monro informed the Bank of its intention to exercise its option of extending the lease in a letter dated August 29, 2002:

Please accept this letter as Monro Muffler / Brake, Inc.'s official notification of our intent to renew said lease agreement for the first five-year renewal period commencing November 1, 2002 and expiring October 31, 2007. . . .

Tenant shall have two five-year renewal options remaining. Please sign below as confirmation of said renewal and fax back. . . .

The Bank refused to confirm the extension, informing Monro of its decision in a letter dated September 5, 2002: "I acknowledge receipt of your request to renew the lease for the above premises; however, the time period within which to exercise the right to renew the lease expired on or about August 2, 2002. Therefore, effective November 1, 2002, the lease for the above premises is terminated."

In the hearing before the circuit court, Aspenleiter testified that he had entered the lease's expiration date into a computer system Monro uses to keep track of its approximately 615 locations. In entering the data, however, he inadvertently entered that the lease called for sixty days' notice of extension, rather than the ninety days stated in the lease. Hence,

Monro's records showed that it had until September 1 to extend the lease.

Monro responded to the Bank's termination of the lease in a letter dated September 11, 2002, stating:

Although, admittedly, the renewal notice was not received ninety (90) days before the expiration of the lease, the intent to renew was clear. The undersigned acquire [sic] the rights to this lease, one of 38 sites acquired earlier this year, with the clear intent of conducting ongoing business in the area. An administrative oversight caused the delayed issuance of the notice to renew, the receipt of which was acknowledged by you on September 5, 2002.

We have no intention of recognizing the termination notice and plan to remain as a tenant under the terms of the renewal lease. . . .

Indeed, Monro refused to vacate the property. In a letter dated September 30, 2002, Monro informed the Bank of its intention to exercise its option to purchase, as provided for in the lease. The parties sought appraisals of the property, and Monro made an offer. But, Aspenleiter testified, Monro ultimately decided not to purchase the property because, under the county zoning regulations, it would also have had to purchase an adjacent lot.

On November 14, 2002, the Bank filed a complaint and summons against tenant holding over in the District Court of Maryland for Baltimore County. On November 19, 2003, Monro filed a petition for judgment of renewal of lease agreement and for declaratory judgment in the Circuit Court for Baltimore County. Pursuant to a consent order from the District Court, the cases were consolidated in the circuit court.

The circuit court held a hearing on October 5, 2004, and issued its disposition of the case on November 4, 2004, "granting Monro's Petition for Judgment of renewal of the lease." The court issued a declaratory judgment to that effect on December 15, 2004. Thereafter, the Bank noted this timely appeal.

## STANDARD OF REVIEW

Maryland Rule 8–131(c) states:

When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

Accordingly, we "review the case on both the law and the evidence." *Id.* When " 'there is any competent, material evidence to support the factual findings below, we cannot hold those findings to be clearly erroneous.' " *Cannon v. Cannon,* 156 Md.App. 387, 404, 846 A.2d 1127 (2004), *aff'd,* 384 Md. 537, 865 A.2d 563 (2005) (quoting *Shallow Run Ltd. P'ship v. State Highway Admin.,* 113 Md.App. 156, 174, 686 A.2d 1113 (1996)). But, whereas "the factual determinations of the circuit court are afforded significant deference on review, its legal determinations are not." *Liberty Mut. Ins. Co. v. Maryland Auto. Ins. Fund,* 154 Md.App. 604, 609, 841 A.2d 46 (2004). "Indeed, the appropriate inquiry for such determinations is whether the circuit court was 'legally correct.' " *Id.* at 609–610, 841 A.2d 46 (citing *Maryland Envtl. Trust v. Gaynor,* 140 Md.App. 433, 440, 780 A.2d 1193 (2001)).

## DISCUSSION

### *I. Was the Lease Effectively Renewed?*

The circuit court granted Monro's petition for renewal of lease agreement because it found that Monro's correspondence with the Bank, including its untimely notice of extension, clearly demonstrated its intent to exercise the extension option. The court also based its decision on principles of equity, granting the extension despite Monro's untimely notice. The Bank contends that the court erred in both respects.

Monro argues that its notice of extension was timely under the terms of the lease. Monro also contends that the circuit court was correct in finding that its correspondence with the

Bank constituted an effective extension. Additionally, Monro presents a number of equitable arguments in support of the circuit court's judgment.

### A. Monro's Notice of Extension

The circuit court did not find that Monro's notice was timely. Rather, the court concluded that its untimely notice was nevertheless effective. The Bank contends that the court erred because "[t]he lease provision at issue in this case is clear and unambiguous," and that "[t]here is no doubt . . . that Monro failed to comply with the renewal provision."

 "Leases are contracts and, as such, are to be construed by application of the well established rules of contract interpretation." *Middlebrook Tech, LLC v. Moore,* 157 Md. App. 40, 65, 849 A.2d 63 (2004). "Maryland follows the law of objective contract interpretation." *Sy–Lene of Washington, Inc. v. Starwood Urban Retail II, LLC,* 376 Md. 157, 166, 829 A.2d 540 (2003). Our "duty is to determine the intention of the parties as reflected in the terms of the contract." *Id.* "When a contract's language is expressed in clear and unambiguous terms, the court will not engage in construction, but will look solely to what was written as conclusive of the parties' intent." *Moore,* 157 Md.App. at 66, 849 A.2d 63. "A contract is ambiguous if it is subject to more than one interpretation when read by a reasonably prudent person." *Sy–Lene of Washington,* 376 Md. at 167, 829 A.2d 540. When the terms of a lease are unambiguous, the interpretation of those terms "involves a question of law for the court to resolve." *Nicholson Air Servs., Inc. v. Bd. of County Comm'rs of Allegany County,* 120 Md.App. 47, 63, 706 A.2d 124 (1998).

 Generally, "[a] landlord is not bound to renew a lease without an express covenant to this effect." Milton R. Friedman, *Friedman on Leases* § 14:1 (4th ed.1997). In this case, the lease provides for an extension option: "LESSEE shall have and is hereby granted a total of 3 successive options to extend the term of this lease for any period of time not

exceeding 5 years for each such option upon the same covenants and conditions as herein provided." The Bank was therefore obligated to extend the lease at Monro's option. With respect to the exercise of that option, the lease states: "If LESSEE shall elect to exercise one or more of such options it shall do so by giving LESSOR written notice at least ninety (90) days prior to the expiration of the primary term or of the then current extension...."

 "A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." Restatement (Second) of Contracts § 224 (1981).

> The question whether the stipulation in a contract constitutes a condition precedent is one of construction dependent on the intent of the parties to be gathered from the words they have employed and, in case of ambiguity, after resort to the other permissible aids to interpretation. Although no particular form of words is necessary in order to create an express condition, such words and phrases as "if" and "provided that," are commonly used to indicate that performance has expressly been made conditional, as have the words "when," "after," "as soon as," or "subject to."

*Chirichella v. Erwin,* 270 Md. 178, 182, 310 A.2d 555 (1973) (citations omitted).

 The option to renew is not ambiguous. It states that "if" the tenant wishes to extend the lease, it "shall do so by" giving the landlord ninety days' written notice. The requirement of ninety days' notice was a condition precedent to Monro's exercising its option to extend the lease.

It is undisputed that the primary lease term ended on October 31, 2002. To provide ninety days' notice, Monro would had to have given such notice no later than August 2, 2002. Its letter attempting to exercise its option to extend was dated August 29, 2002. Monro acknowledges that it failed to provide ninety days' notice, stating in its brief to this Court: "Monro's [sic] provided Chesapeake with sixty-three (63) days

advance notice of Monro's intention to renew by sending its August 29, 2002 letter."

 "Generally, when a condition precedent is unsatisfied, the corresponding contractual duty of the party whose performance was conditioned on it does not arise." *B & P Enterprises v. Overland Equipment Co.*, 133 Md.App. 583, 606–607, 758 A.2d 1026 (2000). Because the requirement of ninety days' notice was a condition precedent to the Bank's obligation to extend the lease, Monro's failure to meet the condition relieved the Bank of that obligation. After August 2, 2002, the Bank no longer had an enforceable covenant to extend the lease.

 Monro argues, however, that its notice of renewal was not untimely because the lease provides that the primary term was to "continue for a period of TWENTY (20) years [from its 1981 signing] unless sooner terminated or extended as hereinafter provided." The lease grants the lessee "3 successive options to extend the term of this lease for any period of time not exceeding 5 years for each such option." Further, the lease states how the tenant may exercise the option to extend: "If LESSEE shall elect to exercise one or more of such options it shall do so by giving LESSOR written notice at least ninety (90) days prior to the expiration of the primary term *or of the then current extension....*" (Emphasis added).

The lease also gives the tenant an option to purchase: "The LESSEE shall further have the right to purchase the leased premises at the expiration of the term of this lease, or any extension thereof.... The contract of sale shall provide for apportionment of rent to the day of settlement...."

After the Bank notified Monro that it was terminating the lease, Monro attempted to exercise its option to purchase. When it learned, however, that it would likely have to purchase the adjacent lot as well, it decided not to purchase the property. In the intervening time, while the parties were negotiating the possible sale, Monro remained in possession of the leased property and continued to pay rent.

In support of its argument that it gave timely notice, Monro states:

Since the Lease contemplated that Monro would remain on the Premise[s] and pay an apportioned rent through the date of settlement, it follows that Monro was a tenant in good standing under the Lease during the entire time that it was operating in good-faith to purchase the Premises. It also follows that the purchase and appraisal period could be construed as a "then current extension" of the Lease, as that phrase was used in the Lease. Accordingly, for the purposes of considering the import of Monro's twenty-seven day omission, and the fact that the parties operated under the extended Lease period until at least November 2003 when Monro filed its court action. Monro's notice letter was ultimately received by Chesapeake well outside of any ninety-day period before the Lease would have terminated.

We are not persuaded. "Contract interpretation involves discerning the terms of the contract itself. The terms of the contract must be interpreted in context and be given their ordinary and usual meaning." *Moore*, 157 Md.App. at 66, 849 A.2d 63. The reference to "the then current extension" in section 4 of the lease follows the provision giving the tenant the right to "3 successive options to extend." The only way to create a "then current extension" is in accordance with the terms of section 4 of the lease. In order to exercise its first option to extend, the tenant must provide "written notice at least ninety (90) days prior to the expiration of the primary term."

In 2002, Monro was still in the twenty year "primary term" of the lease. It had not yet exercised any of its three successive options to extend. Because Monro did not give ninety days' notice prior to the expiration of the primary term, the time during which it was in possession of the property while negotiating to purchase was not a "then current extension" under the lease.

Monro also argues that, because the lease provided for a twenty-year primary term and three five-year extensions, it is

"a single document that was intended to serve as the sole contract between the parties ... for the next thirty-five years [after its signing]." According to Monro:

[R]eview of the "four corners" of the Lease at issue provides overwhelming indicators that the original parties to the Lease did not intend for the twenty-seven day mistake by Monro to be a material shortcoming warranting complete forfeiture under the Lease. Instead, the Lease evidences that the original parties contemplated a mutually beneficial lease arrangement, including joint development of the parcels.

In support of its argument, Monro cites *Schaeffer v. Bilger,* 186 Md. 1, 45 A.2d 775 (1946). In *Schaeffer,* a lease gave the tenant an option to purchase the property " 'during the period of the term hereby created,' " upon sixty days' notice. *Id.* at 3, 45 A.2d 775. The lease also included an option to extend. The issue before the Court was whether the tenant could exercise its option to purchase during an extension, or whether it had to have exercised the purchase option during the primary term. The Court concluded:

We think the intention of the parties in the instant case, as gathered from the lease executed by them, is clearly that the option to purchase should continue during the extended term.... There may be, and doubtless can be, distinctions drawn between provisions in different leases, and the earlier decisions make much of these distinctions, but the present tendency and, we think, the better rule, is to hold that where a lease with a right of renewal or extension contains an option to purchase, it will be considered as an indivisible contract.

*Id.* at 9, 45 A.2d 775.

In *Schaeffer,* the Court noted: "It seems to be generally agreed that [this issue] depends upon the intention of the parties to be gathered from the lease itself." *Id.* at 4–5, 45 A.2d 775. Accordingly, the Court determined that the lease demonstrated that the intent of the parties was to allow for the exercise of the option to purchase during an extension of

the lease. In the present case, the lease clearly shows that the parties intended that the tenant have the option of extending the lease. But, as explained *supra,* the tenant was to exercise its option by providing written notice at least ninety days in advance of "the expiration of the primary term or of the then current extension."

Monro argues, "[a]lternatively, the Lease should be deemed ambiguous because it did not address the particular circumstances that ultimately faced these parties." That is, Monro contends that the lease does not provide for the possibility that "the tenant elected to purchase the Premises but ultimately concluded that purchase could not occur without having to purchase additional property that was not part of the Premises.... [The lease is] silent as to what rights existed if the purchase was not consummated."

"A contract is ambiguous if it is subject to more than one interpretation when read by a reasonably prudent person." *Sy–Lene of Washington,* 376 Md. at 167, 829 A.2d 540. Again, the lease before us provides for a twenty year "primary term" and three successive optional extensions of up to five years each. It also gives the tenant an option to purchase, which may be exercised "at the expiration of the term of this lease, or any extension thereof." These terms are not subject to divergent interpretations when read by a reasonably prudent person.

To be sure, the lease does not expressly address the specific situation in which Monro finds itself. Nonetheless, the terms of the lease establish the rights and duties of both parties in the event the exercise of the option to purchase does not result in a sale. At the expiration of the primary term, or the first or second extension, the tenant may exercise its option to extend by providing ninety days' written notice. Then, if the tenant attempts to exercise its option to purchase, the tenant could remain during the lease extension if the sale did not go through. On the other hand, if the tenant does not properly extend the lease, or is in the third and final extension, and unsuccessfully attempts to exercise its option to purchase, the

landlord-tenant relationship established by the lease ends at the completion of the then current term. At that point, the parties may negotiate a new lease, or go their separate ways. Because Monro failed to properly exercise its option to extend, the Bank may require a new lease or seek a new tenant.

### B. Despite its Untimely Extension Notice, Did Monro Effectively Extend the Lease?

Relying on *Beckenheimer's, Inc. v. Alameda Assocs. Ltd. P'ship*, 327 Md. 536, 611 A.2d 105 (1992), the circuit court concluded that Monro effectively extended the lease despite its failure to give timely notice. *Beckenheimer's* involved a sublease that included a term giving the sublessee, Beckenheimer's, the option to renew the sublease "for five additional terms of five years each." *Id.* at 539, 611 A.2d 105. To exercise its option to renew, the sublease required that Beckenheimer's give 120 days' notice, not be in default, and have a net worth equal at least to its net worth at the time of execution of the sublease. Beckenheimer's gave a timely notice of renewal, but it was written on the letterhead of Beckenheimer's' parent company and did not include a statement of Beckenheimer's' net worth. The sublessor, Acme, informed Beckenheimer's that, because its notice did not comply with the requirements of the sublease, it considered the sublease to have expired. Finding that Beckenheimer's had failed to validly renew the sublease, the circuit court granted summary judgment.

On appeal, the Court of Appeals explained that the case did not involve an untimely attempt at renewal, but rather, a timely notice of renewal that failed to meet other required conditions:

Beckenheimer's did not cause Acme to have in hand on or before May 4, 1989, a notice of renewal that strictly complied with the Sublease's renewal provisions. To determine whether Maryland equity can assist Beckenheimer's we must first determine precisely what deficiencies taint the attempted renewal. The appellees say that Beckenheimer's did not act within the time required by the Sublease. This

argument, more precisely, is that the letter of April 26 should not be considered to have any effect, not because it was untimely, but because it did not comply with certain conditions for renewal, other than timeliness.

*Id.* at 545–46, 611 A.2d 105.

The Court noted that there were three alleged defects in Beckenheimer's renewal attempt, the first of which was that the letter of renewal was from the parent company, rather than Beckenheimer's. Acme based its argument on the fact that the notice of renewal was written on the parent company's letterhead due to Beckenheimer's mistaken belief that the parent company held the sublease. The Court "tested" Acme's argument by considering whether Acme could have enforced a renewal based on the letter:

> Appellees' argument can be tested by reversing the direction of the action. Assume that, after receipt by Acme of the April 26 letter, Beckenheimer's vacated the premises, and Acme was suing Beckenheimer's to enforce an allegedly renewed lease. Further assume that Beckenheimer's moves for summary judgment on the ground that it thought that [the parent company] held the sublease and that an attempted renewal by [the parent company] was of no legal effect. Summary judgment for Beckenheimer's would be denied. The renewal letter identifies the sublease being renewed by its date [and] by the parties to it. . . . Were a trier of fact to find, in the hypothetical, that a reasonable person in the position of Acme objectively would conclude that it was Beckenheimer's that was renewing by the April 26 letter, there would be sufficient evidence to support that conclusion.

*Id.* at 547, 611 A.2d 105. The Court stated that "[t]he exercise of the option to renew should be viewed much like the formation of a contract. The option is a continuing offer by Acme which may be accepted by complying with the conditions of the offer." *Id.* at 546, 611 A.2d 105. Thus, the letter was an effective, timely notice of renewal because it "clearly manifests an intent to accept that offer." *Id.*

Here, the circuit court interpreted *Beckenheimer's* as articulating a test that is applicable to this case: "The [*Beckenheimer's*] Court stated that in considering whether Beckenheimer's attempt at renewal was satisfactory, the test is to hypothetically reverse the situation so that the test would be, could Acme hold Beckenheimer to the leas[e] if Beckenheimer's claimed that the renewal was invalid?" The circuit court applied the *Beckenheimer's* "test" to the communications between Monro and the Bank. The court noted Monro's May 8, 2002 letter to the Bank, which concluded: "We look forward to a long and prosperous relationship with you. . . ." The court also considered Monro's August 8, 2002 letter, in which it stated that it was updating its landlord contact information, and August 29, 2002 letter, in which it made an untimely attempt to extend the lease. From these, the court concluded: "If Chesapeake were trying to enforce this renewal of the lease under the reverse test in *Beckenheimer*, they would prevail because it was clearly Monro's intent to renew the lease and every communication sent by Monro indicated their intent to renew."

In *Beckenheimer's*, the Court discussed a hypothetical reversal of the facts to "test" the strength of appellee's argument in favor of summary judgment. In addition, Beckenheimer's, mistakenly through its parent company, gave its renewal notice in a timely manner. The intent to renew was clear. We are not persuaded that *Beckenheimer's* controls this case. The Court did not set forth a test to be used in cases involving the timeliness and sufficiency of a notice of renewal or extension. Rather, the Court discussed the hypothetical situation in which the facts were reversed to "test" the strength of appellee's argument in favor of summary judgment.

Moreover, hypothetically reversing the facts in this case does not save Monro from the effects of its oversight. As in *Beckenheimer's*, the option in Monro's lease "is a continuing offer by [the Bank] which may be accepted by complying with the conditions of the offer." *Id.* at 546, 611 A.2d 105. In

contrast to the facts in *Beckenheimer's,* however, Monro's May 8, 2002 letter did not "clearly manifest[ ] an intent to accept that offer." *Id.* The letter merely informed the Bank that Monro had purchased Kimmel. The statement "[w]e look forward to a long and prosperous relationship with you" makes no reference to the option to extend. Furthermore, there is no evidence that either Monro or the Bank viewed the statement as an exercise of the option to extend. The August 8, 2002 letter merely stated that Monro was updating its landlord contact information and likewise did not constitute an extension of the lease. We are not persuaded that the communications prior to August 28, 2002, between Monro and the Bank, whether considered individually or as a whole, constitute a "clear manifestation of intent to accept the offer to [extend]" within the time required by the lease. *Id.* at 546–47, 611 A.2d 105.

### C. Does Equity Require Extension of the Lease?

The circuit court found that, based on principles of equity, it was not necessary that Monro strictly adhere to the terms of the lease. Monro argues a number of bases for the circuit court's grant of equitable relief. We begin with the circuit court's assertion that "the *Beckenheimer* case makes it clear that strict compliance with the lease terms is not required." In *Beckenheimer's,* one of the defects in the sublessee's renewal attempt was that it failed to include a statement of net worth. Beckenheimer's provided the statement fifteen days after the deadline for renewal. It argued on appeal that "equity would enforce the renewal covenant ... because, under the renewal provisions of the Sublease, time is not of the essence in furnishing the certified financial statement." *Beckenheimer's,* 327 Md. at 550, 611 A.2d 105.

The Court noted that the provision of a certified statement of net worth, along with the notice of renewal, was for Acme's convenience. Its purpose was to assist Acme in determining whether Beckenheimer's was actually of sufficient net worth. The Court concluded, based on general principles of equity, that this term of the sublease need not be strictly enforced:

> Equity would not give the requirement for including a certified financial statement with the notice of renewal a narrow and technical construction. Under the facts here, equity would not view the timing of receipt of that statement as of the essence, just as a tender of price is not always of the essence in exercising an option. Phrased another way, under the facts here, equity, in its discretion, could grant specific performance of the option to renew.

*Id.* at 553, 611 A.2d 105.

Next, the Court determined that the requirement that Beckenheimer's be of sufficient net worth at the time of the notice was a condition of renewal. On the other hand, the requirement that it submit a certified financial statement along with the notice was merely a covenant. The Court concluded:

> The foregoing discussion has been in terms of the power of equity, because that is the way in which Beckenheimer's has argued its position. A more modern expression of the concepts relied upon above is that the particular provision for including a certified financial statement with the notice of renewal is a covenant and not a condition.... The breach by Beckenheimer's of the covenant to include a financial statement with the notice of renewal is not a material breach. Seemingly, only nominal damages are involved as compensation for the breach. Inasmuch as the three express conditions precedent to Acme's contractual duty to renew have been fulfilled, equity could specifically enforce the covenant to renew.

*Id.* at 553, 555–56, 611 A.2d 105 (footnotes omitted).

Thus, although the Court in *Beckenheimer's* concluded that equity would permit a renewal of the sublease, it did so in the context of a timely notice of renewal, albeit one that did not strictly comply with the terms of the sublease in other respects. Moreover, the Court treated the requirement that Beckenheimer's provide a statement of net worth as a covenant, rather than a condition. The Court noted, however, that the requirement of 120 days' notice was an express condition

to renewal of the sublease, which was satisfied by Beckenheimer's' letter. We are not persuaded that the *Beckenheimer's* Court would have allowed for a renewal of the sublease had Beckenheimer's failed to meet the condition of timely notice of renewal.[1] Additionally, cases cited in *Beckenheimer's* involving options demonstrate that strict compliance with the time requirement of a notice provision is required.

*Beckenheimer's* cites *Foard v. Snider*, 205 Md. 435, 109 A.2d 101 (1954), which involved the issue of whether an option to repurchase in the sale of a farm was enforceable. The Court of Appeals noted that appellee had not raised the issue of whether appellant exercised the option within the time required by the agreement, but stated in *dicta:* "Time is of the essence in a unilateral contract, such as an option, both in law and in equity, whether expressly declared to be so or not." *Id.* at 446, 109 A.2d 101. The Court stated further:

> Each such agreement must be scrutinized to see what it requires to be done within the specified time, either expressly or by necessary implication. Does it require completed performance, that is, actual payment, or does it require tender of the agreed price? Generally, there is contemplated only a notice of acceptance of, and a readiness and willingness to perform, the irrevocable offer which is an option. Whatever the option requires must be done. As in the case of all offers, revocable or irrevocable, the exercise must be unconditional and in exact accord with the terms of the option.

*Id.* at 446, 109 A.2d 101.

In *Coleman v. Applegarth*, 68 Md. 21, 27–28, 11 A. 284 (1887), which is also cited in *Beckenheimer's*, the Court of Appeals stated with respect to an option to purchase:

---

1. The Court declined to consider this issue, stating: "This holding makes it unnecessary for us to consider the additional argument by Beckenheimer's that equity could give relief even if the notice of renewal had not been timely." *Beckenheimer's*, 327 Md. at 556 n. 7, 611 A.2d 105.

The contract set up is not one of sale and purchase, but simply for the option to purchase within a specified time, and for a given price.... There was no mutuality in it, and it was binding upon [the seller] only for the time stipulated for the exercise of the option. After the lapse of the time given, there was nothing to bind him to accept the price and convey the property.... When the time limited expired, the contract was at an end, and the right of option gone, if that right has not been extended by some valid binding agreement, that can be enforced. This would seem to be the plain dictate of reason, upon the terms and nature of the contract itself....

More recently, the Court of Appeals has affirmed: "It is well settled that to be valid, the exercise of an option must be unequivocal and in accordance with the terms of the option." *Katz v. Pratt St. Realty Co.*, 257 Md. 103, 118, 262 A.2d 540 (1970) (citations omitted). "The optionee has what is usually termed a power of acceptance, and when he accepts the offer in the prescribed manner, the option is thereby exercised and creates a binding bilateral contract." *Straley v. Osborne*, 262 Md. 514, 521, 278 A.2d 64 (1971). Indeed, "[w]hen the optionee decides to exercise his option, he must act unconditionally and according to the terms of the option." 1 Richard A. Lord, *Williston on Contracts* § 5:18 (4th ed.1990).

Certainly, "a court of equity has no right to modify a contract between the parties absent collusion, mistake or fraud." *Grossman v. Grossman*, 234 Md. 139, 144, 198 A.2d 260 (1964). "Equitable principles.... may affect the construction or performance of contracts, but ordinarily they do not ignore or override the terms of lawful contracts." *Cent. Sav. Bank of Baltimore v. Post*, 192 Md. 371, 381, 64 A.2d 275 (1949).

The rule recognized by this Court is that parties of sound mind and under no legal disabilities, and not occupying fiduciary relations, are left free to make such contracts as to them seem wise. The courts will not reform or rescind such

contracts without the consent of the parties, when there is no fraud, misrepresentation, mistake, undue influence, or fiduciary relation shown to exist, or unless the equities are such that they should not be enforced.

*Gardiner v. Gardiner,* 200 Md. 233, 240, 88 A.2d 481 (1952).

The circuit court noted the Bank's failure to inform Monro that the lease term had expired, stating that "when Monro sent the letter of August 8th to verify the landlord information, Chesapeake could have taken that opportunity to inform Monro that the time for renewal had past [sic], but it appeared that Chesapeake simply provided the requested information." Monro asserts that, prior to its untimely notice of renewal on August 29, 2002, the Bank was not aware that the lease term was about to expire. In oral argument, Monro argued that it detrimentally relied on the Bank's earlier correspondence, in which the Bank failed to notify Monro that the deadline for extension had passed and that it intended to negotiate a new lease agreement or find a new tenant.

▆▆▆ We are not persuaded that the Bank's failure to give Monro notice that the deadline for extending the lease had passed supports Monro's equitable argument. The Bank did not have a duty to inform Monro that the deadline was approaching, or that it had passed. *See* Friedman, *supra,* at § 14:2 (stating that "[a] landlord is under no duty to remind a tenant of the tenant's time to elect to renew"); *Ganson v. Goldfader,* 148 Misc.2d 608, 561 N.Y.S.2d 366, 369 (Sup.1990) (noting that "the landlord had no duty to personally notify [a tenant] of the upcoming renewal," except as provided by statute); *Grisham v. Lowery,* 621 S.W.2d 745, 751 (Tenn.App. 1981) (holding that "while [the landlord] did not help [the tenants] to exercise their option [to purchase], we find no duty on her to do so"). Under the terms of the lease, Monro was required to give notice that it was exercising its option to extend the lease no later than August 2, 2002. The Bank's failure to assist Monro in remembering the August 2 deadline does not serve as an equitable basis for extending the lease in spite of Monro's oversight.

The circuit court also stated that "the delay of approximately 27 days caused no harm or prejudice to Chesapeake." Monro contends that, "[i]n light of the exceedingly harsh forfeiture that Monro faced, compared to absolutely no damages that Chesapeake faced by relieving the omission, the trial court did not err in granting equitable relief." Monro argues further that "Maryland courts have long recognized that equity can step in and ameliorate a particularly harsh result when adjudicating lease disputes."

In support of its argument, Monro cites several cases that involve forfeiture of leases. In *Nicholson Air Servs., supra,* the lessee had breached the lease by failing to pay rent, and the lessor had notified the lessee that the lease was terminated. Nevertheless, the lessee argued that, because it had offered to pay all rent that was past due, and all future rent in advance, equity should intervene to prevent the forfeiture. We noted that "[t]he decision whether to invoke a court's equity powers to grant relief from forfeiture is within the discretion of the trial court." *Nicholson Air Servs.*, 120 Md.App. at 71, 706 A.2d 124. We concluded that because the lessee had promised to pay all rent only after the lessor filed an attachment action, and because the lessee's financial problems had negatively affected the lessor's business, equity would not save the lessee from forfeiture. *Id.* at 71–72, 706 A.2d 124.

Similarly, in *Rose & Crown, Ltd. v. Shaw Enters., Inc.,* 28 Md.App. 548, 558, 346 A.2d 459 (1976), the lessee breached the lease agreement by failing to pay rent and failing to provide certain financial statements to the lessor. In considering whether equity would avoid a forfeiture, we stated:

" 'But Courts of equity are only closed against the tenant where the forfeiture is incurred by his wilful and culpable neglect to fulfill the terms of his covenant and not in cases where the omission has been occasioned by inevitable accident. And the general rule to be applied to all such cases seems to be that Courts of equity will relieve where the omission and subsequent forfeiture are the result of mistake or accident and the injury and inconvenience arising from it

are capable of compensation; but where the transaction is wilful, or the compensation impracticable, they invariably refuse to interfere.' "

*Id.* at 558, 346 A.2d 459 (quoting *Wylie v. Kirby,* 115 Md. 282, 287, 80 A. 962 (1911)). We concluded that the case did not warrant equitable relief because of the lessee's bad faith, namely, its intentional burning and manipulation of financial records. *Rose & Crown,* 28 Md.App. at 558, 346 A.2d 459.

Here, however, Monro is not seeking equitable relief from a forfeiture. Rather, Monro failed to meet a condition precedent for the exercise of an option to which it had no right, apart from the terms of the lease. It simply failed to exercise its option, thus allowing the lease to expire. In such a case, the relative hardships are immaterial. *See* Friedman, *supra,* at § 14.2 (stating that if notice is a condition precedent to the exercise of an option to renew, "[i]t follows that a landlord's lack of loss or harm by reason of the late notice is immaterial").

Monro contends that equitable relief is appropriate because "the failure to provide the timely notice was clearly a clerical omission caused by human 'mistake or accident,' not 'willful or culpable neglect.' " In oral argument, Monro argued that the circuit court's extension of the lease should be affirmed on equitable grounds because Monro's failure to provide timely notice was due to a "mistake."

■ It has been said in the context of forfeiture that " 'Courts of equity will relieve where the omission and subsequent forfeiture are the result of mistake or accident.' " *Rose & Crown,* 28 Md.App. at 558, 346 A.2d 459. The only "mistake" in this case was when Monro's Vice President of Real Estate "mistakenly" entered the wrong deadline for notice of extension into the company's computer system. We are not persuaded that equity should grant an extension when a tenant failed to exercise an option due solely to the tenant's oversight. A number of courts in other jurisdictions have reached the same conclusion. *See, e.g., Sentara Enters., Inc. v. CCP Assocs.,* 243 Va. 39, 413 S.E.2d 595 (1992) (holding that

"the powers of equity courts will not be arbitrarily exercised to alter the terms of a contract in order to correct an unfortunate situation resulting from a tenant's negligent failure to observe the contract requirements"); *W. Sav. Fund Soc'y of Philadelphia v. Southeastern Pennsylvania Trans. Auth.*, 285 Pa.Super. 187, 427 A.2d 175 (1981) (denying equitable relief when a tenant failed to renew a lease due to an "administrative oversight"). *See also* William B. Johnson, Annotation, *Circumstances Excusing Lessee's Failure to Give Timely Notice of Exercise of Option to Renew or Extend Lease*, 27 A.L.R.4th 266, § 8(b) (1984) (compiling cases holding that equitable relief is not available when a failure to give timely notice was due to the tenant's "[f]orgetfulness, inadvertence, or oversight").

 Finally, Monro argues that the circuit court properly granted equitable relief based on Md.Code (1974, 2003 Repl. Vol.) § 8–108 of the Real Property Article ("Real Prop."), asserting that "Maryland courts have long recognized that 'courts of equity will help a non-defaulting party' to avoid disproportionate hardships. This long-held public policy is further evidenced by the Maryland Legislature's enactment of REAL PROP. § 8–108. . . ." (Citations omitted). Real Prop. § 8–108(a) states: "A court may enter judgment for the renewal of a lease that contains a covenant for renewal, including a lease for 99 years, renewable forever."

We have been provided no legislative history, and we have found no published cases in the Court of Appeals or this Court, which refer to Real Prop. § 8–108. The Bank has referred us to *Worthington v. Lee,* 61 Md. 530 (1884), which involved a claim for specific performance of a renewal provision in a "ground lease," and cites a predecessor of Real Prop. § 8–108. The *Worthington* Court's apparent reference to the predecessor of Real Prop. § 8–108 was merely for the purpose of stating that it was not required to consider the statute:

What effect the Act passed at the present session of the General Assembly, entitled an "Act to simplify the proceedings for the renewal of leases for ninety-nine years, renewa-

ble forever," may have to give force and effect to the decree, is a question that we need not now decide. It will be time enough to decide that question when it is actually presented. *Id.* at 544.

The Bank asserts that "[t]he utter lack of case law generated by this statute" demonstrates "that the statute is only applicable in rare cases." The Bank argues further that, properly interpreted, the statute applies only to leases that are "renewable forever." Because the lease in the present case is not "renewable forever," the Bank contends that Real Prop. § 8–108 does not support the circuit court's judgment. The cases cited in *Worthington, Myers v. Silljacks,* 58 Md. 319 (1882), and *Banks v. Haskie,* 45 Md. 207 (1876), lend support to that argument.

▮▮▮▮▮ As we have said many times, the " ' "cardinal rule of statutory construction is to ascertain and effectuate legislative intention." ' " *Crespo v. Topi,* 154 Md.App. 391, 396, 840 A.2d 156 (2003) (quoting *State v. Green,* 367 Md. 61, 81, 785 A.2d 1275 (2001)). When we interpret a statute we begin with the text of the statute. *Crespo,* 154 Md.App. at 396, 840 A.2d 156. In some cases, " 'the plain meaning of the statutory language is clear and unambiguous.' " *Id.* (quoting *Breitenbach v. N.B. Handy Co.,* 366 Md. 467, 473, 784 A.2d 569 (2001)). If, however, "persuasive evidence exists outside the plain text of the statute, we do not turn a blind eye to it." *Adamson v. Corr. Med. Servs., Inc.,* 359 Md. 238, 251, 753 A.2d 501 (2000).

Even if we assume, without deciding, its applicability to situations other than ground leases "renewable forever," the plain language of Real Prop. § 8–108(a) merely permits a court to renew a lease. Section 8–108(a) provides: "A court *may* enter judgment for the renewal of a lease that contains a covenant for renewal...." (Emphasis added). That is consistent with the case law, and does not evidence a "long-held public policy" that " 'courts of equity will help a non-defaulting party' to avoid disproportionate hardships," as argued by

Monro. In our view, the statute does not dictate that result in any particular case.

## II. Default

In its declaratory judgment, the circuit court found that Monro's failure to provide ninety days' notice "was, at best[,] a 'default' under the Kimmel/Chesapeake Lease that could have been cured within twenty (20) days of receipt of notification from Chesapeake of the default." The Bank argues that the court's finding was erroneous.

We reiterate that, "[w]hen the clear language of a contract is unambiguous, the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used." *Sy–Lene of Washington,* 376 Md. at 167, 829 A.2d 540. Moreover, "[t]he court's interpretation should not permit an absurd or unreasonable result." *Moore,* 157 Md.App. at 66, 849 A.2d 63.

Section 19 of the lease, entitled "DEFAULT," reads in relevant part:

In the event LESSEE shall default in the performance of any of the terms or provisions of this lease other than the payment of monthly rent, LESSOR shall promptly so notify LESSEE in writing. If LESSEE shall fail to cure such default within twenty days after receipt of such notice, or if the default is of such character as to require more than twenty days to cure and LESSEE shall fail to commence to do so within twenty days after receipt of such notice and thereafter deligently [sic] proceed to cure such default, then in either such event LESSOR may cure such default and such expense shall be added to the rent otherwise due, but any such default shall not work as a forfeiture of this lease.

The lease contains a number of "terms or provisions," of which the failure to perform could lead to a default, including the payment of taxes and maintenance of the premises. Timely notice of extension of the lease, however, is not a "term or provision" of the lease that the tenant is required to "per-

form." Rather, it is a condition precedent to the tenant's exercising its option to extend the lease.

 If failure to satisfy the notice provision is a default that can be cured, the provision itself is rendered meaningless. Under such an interpretation, not only would the tenant not have to provide ninety days' notice, but it could, for example, wait until the last day before expiration of the primary lease term to inform the landlord that it intends to exercise its option to extend the lease. It could then cure the "default" within twenty days *after* notice from the landlord by providing the required written notice. "The purpose of [a notice provision] is to inform the lessor, in advance of the expiration of the term, whether or not the lessee will continue in occupancy, thereby reducing the risk that the premises will remain vacant during efforts at reletting." *Beckenheimer's,* 327 Md. at 552, 611 A.2d 105. To interpret the failure to give timely notice of the intent to renew as a curable default would frustrate the condition of renewal and lead to "an absurd or unreasonable result." *Moore,* 157 Md.App. at 66, 849 A.2d 63.

Monro argues that the default provision is "relevant" because it "provide[s] insight as to how the parties agreed to handle circumstances, which if left uncured, could give rise to forfeiture under the Lease. Since the alleged failure to provide timely notice of renewal could also give rise to the ultimate sanction of forfeiture, the default terms are instructive." The circuit court did not find the default provision in the lease to be merely "relevant" or "instructive." Rather, it stated that Monro's failure to provide ninety days' notice "was, at best[,] a 'default' under the Kimmel/Chesapeake Lease that could have been cured within twenty (20) days." We conclude that the court's finding was erroneous.

For the reasons discussed in detail, *supra,* we conclude that the circuit court erred in finding that Monro effectively exercised its option to extend, either under the terms of the lease or based on the principles of equity. We shall therefore reverse the circuit court's declaratory judgment renewing the lease agreement between the Bank and Monro, and remand

this case to the circuit court to enter judgment in favor of the appellant.

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEE.**